[No. 3939.]

THE INTERNATIONAL TRUST CO., TRUSTEE, v. THE UNITED COAL CO. ET AL.

1. CORPORATIONS—RECEIVERS.

A receiver should not be appointed for a corporation in an action by a simple contract creditor to prevent the corporation from fraudulently disposing of its property, and putting beyond its power the ability to respond to a judgment sought to be obtained on an unsecured debt.

2. CORPORATIONS—RECEIVERS—RAILROADS—EXPENSE OF OPERATION —PRIOR LIENS.

Where a receiver has been appointed for an insolvent railroad corporation pending a suit to foreclose a mortgage executed by the company, the road may be operated by the receiver and the expenses of operation, incurred by him, as well as certain kinds of indebtedness theretofore incurred by the company, may be made a first lien upon the income, and if that is not sufficient for the purpose, then upon the *corpus* of the property superior to that of the prior mortgage, but this doctrine does not apply to ordinary private corporations engaged in purely private business. In administering the affairs of an ordinary insolvent private corporation for which a

receiver has been appointed, a court of equity has not the power to authorize the receiver to incur indebtedness for carrying on the business, and to make the same a lien upon the property superior to that of prior lien holders without their consent, unless such indebtedness relate strictly to, and is necessary for, the preservation of the *status* of the property at the time of the appointment of the receiver.

3. CORPORATIONS—RECEIVERS—EXPENSE OF OPERATING COAL MINE—PRIORITY OF LIENS.

Expenses incurred by a receiver of a coal company in operating its mine, mining and selling coal, cannot be made a lien on the property prior to that of mortgage bondholders on the ground that it was necessary to preserve the *status* of the property, nor on the ground that the expense incurred enriched the bondholders by adding value to the property.

4. SAME—ESTOPPEL.

Where a receiver was appointed for an insolvent corporation at the suit of an unsecured creditor to prevent the corporation from disposing of its property, the fact that the trustee and bondholders secured by a first mortgage on the property of the corporation knew that the receiver was conducting the business of the corporation and did not object thereto nor take any active steps to intervene in the suit, nor bring immediate suit to foreclose the mortgage did not estop them from objecting to the expenses incurred by the receiver in operating the business being made a prior lien to their mortgage lien, where the holders of the receiver's certificates had notice of the mortgage and the trustee and bondholders on every occasion when called upon to act protested against anything that would give preference over them to persons dealing with the receiver.

5. MORTGAGES—BONDS—TRUSTEES.

Where a trustee in a mortgage, executed by a corporation to secure bonds, is improperly made a party to a suit by an unsecured creditor against the corporation, the bondholders are not bound by the action of the trustee.

*Appeal from the District Court of Arapahoe County.*

IN the year 1891 the United Coal Company was organized under the laws of this state for the purpose of acquiring coal lands and mining and selling coal. On July 1, 1892, it borrowed $500,000 evidenced by 500 of its negotiable bonds in the sum of $1,000 each, and to secure their payment executed a mortgage to the International Trust Company, as trustee, upon the properties which it then owned in Boulder county,

Colorado, which are designated in the record as the northern mines or properties.

Between the 18th of July, 1892, and the end of that year, the company borrowed of the German National Bank of Denver, about $88,000, and as collateral security for the same deposited with the bank 125 of its first mortgage bonds.

Out of the money thus borrowed the company acquired by purchase a leasehold interest in the Peerless and Oak Creek coal mines, the former situate in Las Animas county, the latter in Fremont county, Colorado, which are called the southern mines. James Cannon, Jr., was the president and managing officer of the United Company, and while occupying that relation he organized, in connection with other persons, the Peerless Coal Mining Company and the Oak Creek Coal Mining Company, and he improperly induced the former to buy, and the United Coal Company to sell, its leasehold interest in the Peerless mine for $100,000, $30,000 of which was paid in cash, and for the balance of $70,000 were taken the unsecured notes of the Peerless Company; and Cannon fraudulently influenced the United Coal Company to sell, and the Oak Creek Company to buy, the leasehold interest in the Oak Creek mine for a total consideration of $75,000, $20,000 of which was paid in cash, and promissory notes of the vendee without any security were given for the balance of $55,000. The United Coal Company then took a lease of these two mines and operated them thereunder.

After acquiring the obligations of the Oak Creek and Peerless companies, the United Coal Company became indebted to divers persons, with whom, after indorsing these promissory notes, it hypothecated them as collateral security. Cannon then, by fraudulent conduct, prevailed upon the Peerless and Oak Creek companies to agree to transfer and assign to third parties their respective interests in the Peerless and Oak Creek mines, which were their only assets, which action, if consummated, would render them insolvent and unable to meet their outstanding obligations. As president, and in his capacity of manager of the United Coal Company, he,

also, improvidently conducted its affairs, and was guilty of other acts which tended to injure its creditors.

At this juncture the German National Bank of Denver, in the month of April, 1894, instituted an action in the district court of Arapahoe county against these three corporations, the complaint setting forth at great length the facts outlined in the foregoing statement.

The relief prayed was a temporary injunction restraining the Peerless and the Oak Creek companies from transferring, assigning or incumbering any of their properties, to the end that the same might be subjected to the payment of their indebtedness and of their obligations guaranteed by the United Coal Company; for the appointment of a receiver of the defendant companies and particularly of the coal mines known as the Peerless and Oak Creek mines; and that the receiver be allowed to operate them during the suit, the only ultimate object of which was to recover judgment against the United Coal Company for the sum of $88,000 which it had borrowed of the plaintiff bank.

Injunctive writs were granted, and, after notice to the United Coal Company, H. C. Brooks was appointed receiver of the defendant companies, with power to conduct the business in the usual and ordinary manner until the further order of the court. He immediately took possession, and conducted the business as it had theretofore been carried on until March 26, 1895, when he resigned, and was succeeded by Edward F. Bishop, who continued to operate the properties until August 4, 1896, when the International Trust Company, the appellant herein, instituted its action in behalf of the first mortgage bondholders to foreclose the mortgage above referred to.

The mortgage or deed of trust held by the International Trust Company embraced only the northern properties, and did not include either of the subsequently acquired southern properties. The principal defendant, the United Coal Company, had no interest either in the Oak Creek or Peerless mine, outside of the operating contracts referred to, and ex-

cept that it had pledged the notes of these companies and was liable as guarantor or indorser.

When Brooks was appointed receiver, the entire issue of the bonds covered by the mortgage had been certified by the trustee and were outstanding, and, while the complaint does not allege any default of the mortgagor, it seems that a part of the interest due on the bonds had not been paid at the time the bank brought its suit. The unsecured indebtedness of the United Coal Company when the receiver was appointed amounted to about $200,000, and though the complaint in the bank suit alleged that the Peerless and the Oak Creek mines were worth several hundred thousand dollars, and that the total assets of the United Coal Company, including its leasehold interests, were sufficient to pay the bonded indebtedness and the unsecured creditors, it conclusively appears that the only available assets of the United Coal Company were the northern mines covered by the mortgage, and some book accounts, and what value these operating contracts possessed, and the notes of the Peerless and Oak Creek companies which the United Company pledged in borrowing money. Included in this unsecured indebtedness was $80,000 due to miners for labor done in, and to merchants for supplies furnished to, the mines. A large part of the money borrowed by the receivers on the receivers' certificates was devoted to the payment of this debt, which all concede was contracted long after the mortgage was recorded and thus inferior thereto. While operating the properties, the two receivers contracted a total indebtedness of about $75,000, which is the subject-matter of the controversy before this court. In June, 1896, under an order of the court, the receiver in the bank suit sold the Oak Creek mine, and to the owners and purchasers the court ordered receiver's certificates to issue for money which was due them on an operating contract in force between the receiver and the Oak Creek Coal Company, and these were adjudged in the court below a first and paramount lien upon all the northern properties of the United Coal Company. The bondholders' receiver

promptly abandoned the contract pertaining to the Peerless mine, and made no claim whatever upon either of the southern properties.

When the International Trust Company filed its complaint to foreclose the mortgage, the district court, after appointing John L. McNeil receiver, to whom Bishop was directed to turn over the property of the United Coal Company, entered an order consolidating the action with the suit of the German National Bank above referred to, and in the order of consolidation provided that future proceedings should be conducted under one title, and expressly reserved jurisdiction to hear and determine all matters growing out of the bank suit or arising out of the receivership, as if no consolidation had taken place. It was further provided that appellant's receiver, by taking possession of the mortgaged property, should take the same subject to all valid claims arising out of the receivership in the bank case, as the same might be thereafter judicially ascertained, provision being specially made that his appointment should in no wise affect the validity or priority of the claims against the former receivers, the court expressly reserving to itself for future consideration the determination of the respective priority and right of each and every claimant or creditor of the receivers in the bank case.

Under the order of the court, the bondholders' receiver gave notice to all parties interested, including creditors and claimants against the receivers in the bank case, and these parties were given leave to present, and they filed, their claims for the consideration of the court. Soon after the bondholders' suit was begun, the Trust Company (appellant here) filed a petition reciting the facts concerning the contracting of the indebtedness by the receivers in the bank case, and setting forth that, in response to its notice, numerous creditors of these receivers had filed claims in the court for large amounts of money, claiming to be entitled to a preference over the mortgage bonds, and after setting forth that a large part of this indebtedness was contracted by the receiv-

ers in operating the southern properties which were not covered by appellant's mortgage, and inasmuch as the trustee could not pass upon or determine either the amount or the priority of these claims, an order of reference was asked of, and made by, the court, and a referee was appointed to take testimony and report, which was done, and the court, in passing upon his report, approved his findings and on March 20, 1898, made a final decree of foreclosure and sale in which it made certain of the indebtedness incurred by the receivers in operating the properties a first and prior lien upon the mortgage properties superior to the lien of the deed of trust held by the appellant as trustee.

After providing for the sale, and the payment of the costs and expenses thereof, the decree directed that the first proceeds should be applied to the payment of the certificates of indebtedness issued by the receivers, and which had been made prior liens by the court, and that the balance, if any, should then be applied to the payment of the mortgage bonds.  In the complications developed in the progress of the causes, it seems that the original purpose of the bank suit was abandoned or lost sight of.  The bank itself, soon after it began its suit, passed into a receiver's hands, and its suit was never prosecuted to judgment.  The International Trust Company, as trustee for the holders of the bonds, appealed from such portion of the decree as made any of the indebtedness a prior lien to the bonds.

The foregoing statement sufficiently indicates the general nature of the questions brought up for review, though it is but a mere outline of what is contained in the voluminous record.  Such additional facts as will elucidate the points in controversy will be found in the opinion.

Mr. JOHN S. McBETH, for appellant.

Mr. WILLARD TELLER, Messrs. HODGES, WILSON & HODGES, Mr. F. A. WILLIAMS, Mr. G. Q. RICHMOND and Mr. CHARLES E. GAST for appellees.

CHIEF JUSTICE CAMPBELL delivered the opinion of the court.

The immediate and principal question for our determination is whether the lien of the receivers' certificates is senior or junior to the lien of the prior recorded mortgage. The discussion of that question, however, will be simplified by considering briefly the nature of the action brought by the German National Bank.

Though the bank held as collateral security for its loan to the United Coal Company some first mortgage bonds of the latter, the action which it instituted was not for the purpose of foreclosing the mortgage, or protecting its interests as a bondholder. Fairly considered, the principal, and, in fact, the sole, object of the action was to conserve, for the benefit of an unsecured creditor seeking a judgment, the assets of his debtor, if any, exclusive of those covered by the debtors' prior mortgage. The plaintiff in that case, therefore, cannot be considered in any sense as a representative of the bondholders, or as having brought the suit for the purpose of protecting their interests. It described itself as a pledgee of bonds only to acquire an additional standing in court, to be heard upon a complaint that the assets of the company that issued the bonds, in excess of the amount of the bonded debt, were about to be squandered, and, for that reason, a receiver should be appointed to conserve them for a creditor whose debt could be made only out of such surplus.

The appointment of a receiver at the instance of the bank is, perhaps, not directly, or necessarily, before us upon this review, but lest our silence concerning it might be misconstrued as an approval of the court's action, we take this occasion to declare that a receiver should not have been appointed; and while the court, in making the appointment, may not have been without jurisdiction, still the case was not one which called for the exercise of that power. As already indicated, instead of being in the nature of a suit to foreclose a lien, it was, on the contrary, avowedly an ac-

tion by a simple contract creditor to prevent a debtor from fraudulently disposing of its property, and putting beyond its power the ability to respond to a judgment sought to be obtained on an unsecured note.

In a series of cases decided by the supreme court of the United States, beginning with *Wallace v. Loomis*, 97 U. S. 146, and including among many other cases that might be cited *Fosdick v. Schall*, 99 U. S. 235, *Barton v. Barbour*, 104 U. S. 126; *Miltonberger v. Logansport Ry. Co.*, 106 U. S. 286, *Union Trust Co. v. Souther*, 107 U. S. 591, *Burnham v. Bowen*, 111 U. S. 776, *Union Trust Co. v. Ill. Midland R. R. Co.*, 117 U. S. 434, *Wood v. Trust Co.*, 128 U. S. 416, 421, *Kneeland v. Amer. Loan & Trust Co.*, 136 U. S. 89, and *Morgans, etc., Co. v. Texas Cent. R. R. Co.*, 137 U. S. 171, in which receivers of insolvent railway companies have been appointed, the doctrine has become firmly established that, pending a suit to foreclose a mortgage executed by a railroad company, the road may be operated by a receiver, and the expenses of the operation incurred by him, as well as certain kinds of indebtedness theretofore contracted by the company, may be made a first lien upon the income, and if that is not sufficient for the purpose, then upon the *corpus* of the property, superior to that of the prior mortgage.

Counsel representing the holders of the receivers' certificates in this case invoke this doctrine, and seek to extend it to certificates issued by a receiver under the order of the court in administering upon an insolvent private corporation. In passing, it may be observed that in every case in which the doctrine has been applied, the suit was one by the trustee either to foreclose a mortgage, or to defend or protect as against a stranger seeking to enforce or destroy the trust, the rights of the bondholders. Our attention has been called to but one case in which this doctrine has been extended to an ordinary insolvent private corporation, and that is the case of *Ellis v. Water Co.*, 86 Tex. 109. The learned judge delivering the opinion states that he can perceive no difference in principle, so far as the applicability of the doctrine is con-

cerned, between railroads and ordinary private corporations, and cites in support of his conclusion *Appeal of Nesfie*, 12 Atl. Rep. 271. But an examination of the facts of that case shows that the parties then before the court, including creditors, consented to the order displacing their prior lien. This being true, it is not in point. After having decided the case on general equity principles, the Texas court proceeds to demonstrate that, under their statute in force at the time the case was decided and the rights of the parties accrued, the expenses of the receiver which were evidenced by the receiver's certificates were expressly made a prior lien to that of a recorded mortgage. So the case cannot be considered as authority for the doctrine contended for here, and the remarks of the court to that effect were clearly *obiter*. Moreover, the case is unlike the case at bar in other particulars, and it might be that the court, in its decision, was influenced by the fact that the interests of the community, which derived its domestic water supply from the property, demanded a continuance of its operation by a receiver.

We are referred to some late cases by the supreme court of the United States which are said to recognize the extension of the rule, as made by the district court. *Cake v. Mohun*, 164 U. S. 311, is cited as one holding that a court of equity has power, through its receiver, to carry on a purely private business, and in doing so to authorize the contracting of indebtedness which it may make superior to a mortgage prior in time. In that case, where a receiver was appointed to conduct a hotel, no question was raised as to the power of the court in the premises. The court authorized the receiver to borrow money to pay expenses and to issue his certificates, but the court did not say that the lien thereof should be paramount and superior to a prior mortgage without the consent of the mortgagees. Indeed, the prior lien holders were not before the court, and yet the decree of foreclosure was made subject to the prior mortgage. The purchasers at the receiver's sale were the ones complaining, but in order to get possession of the property they had given to the receiver an

undertaking, and the court expressly said that the purchasers (the appellants), could not object to the order of the court adjudicating the receiver's certificates superior to their claim (of holding the property free of their lien), because in their undertaking they agreed to pay such sums of money as the court should thereafter find to be due the receiver on account of his expenditures in conducting the hotel. In other respects, not necessary to specify, the case is quite different from the one at bar.

*Kneeland v. Bass F. & M. Works*, 140 U. S. 592, related to a receivership of a railroad property, and is not authority for the contention of appellees. *Fidelity Ins., etc., Co. v. Iron Co.*, 68 Fed. Rep. 623, cited in support of appellees' position, is not in point, for the court there held that the power contended for did not exist unless it was necessary to issue the certificates to preserve the existence of the property and the franchise in the condition in which they were when the receiver was appointed. Nor are *Knickerbocker v. McKindley Coal Co.*, 172 Ill. 535, nor *Thornton v. H. A. & B. R. R. Co.*, 94 Ala. 353, when fairly considered, in point. In the Illinois case the court held that the consent of the appellant, who represented the prior lien holders, was given to the incurring of the indebtedness.

The supreme court of the United States has not directly limited the doctrine to railroad cases, but in some of its later decisions there is a clear intimation that it should be thus restricted, and even in railroad cases the power should be exercised sparingly and with great caution. In *Wood v. Trust Co., supra*, the court said:

"The doctrine of *Fosdick v. Schall* has never yet been applied in any case, except that of a railroad. The case lays great emphasis on the consideration that a railroad is a peculiar property, of a public nature, and discharging a great public work. There is a broad distinction between such a case and that of a purely private concern."

In *Kneeland v. American Loan & Trust Co., supra*, the court in condemning the practice of appointing receivers and

attempting to exercise absolute control over the property, uses this language :

"It has been assumed that a court appointing a receiver could rightfully burden the mortgaged property for the payment of any unsecured indebtedness in preference to the mortgage liens sought to be enforced. Can anything be conceived which more thoroughly destroys the sacredness of contract obligations ? * * * We emphasize this fact of the sacredness of contract liens, for the reason that there seems to be growing an idea, that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens."

In *Farmers' Loan & Trust Co. v. Grape Creek Coal Co.*, 50 Fed. Rep. 481, the court expressly holds that the doctrine which the supreme court of the United States has laid down in railroad receivership cases has no application to private concerns, stating : " This has been done, however, on grounds not applicable to mortgages executed by private corporations." The entire opinion is instructive upon the question before us. In *Raht v. Attrill*, 106 N. Y. 423, a like conclusion was reached in an exhaustive and learned opinion by Mr. Justice Andrews. In *Bound v. So. Carolina Ry. Co.*, 50 Fed. Rep. 312, there was an unsuccessful attempt to apply the doctrine of *Fosdick v. Schall, supra*, to the case of a navigation company which had passed under the control of a receiver. To the same effect, see *Laughlin v. U. S. Rolling Stock Co.*, 64 Fed. Rep. 25, *Fidelity Ins. Co. v. Roanoke Iron Co.*, 68 Fed. Rep. 623, and *Doe v. N. W. Coal Co.*, 78 Fed. Rep. 62.

*Hanna v. State Trust Co.*, 70 Fed. Rep. 2, went up from the circuit court of the United States for the district of Colorado. It was a suit by the second mortgagee to foreclose a mortgage on real estate, in which the prior mortgagees were parties, and in which a receiver was appointed, who applied for leave to issue receiver's certificates to be made a prior lien upon the lands for the purpose of raising money to pay taxes, carry out contracts with purchasers and continue the busi-

ness of the company, which was that of irrigating, improving and colonising arid lands. In a trenchant opinion by Caldwell, J., it was held that the certificates might be issued to pay taxes, but that the court would not, against the objection of the first mortgagees, issue certificates to displace their liens for the other purposes suggested. This case, perhaps, goes farther than some others in limiting the powers of the court in such a case, but we approve, in general, of the wholesome doctrine enunciated. See, also, *Snively v. Loomis Coal Co.*, 69 Fed. Rep. 204, *Baltimore B. & L. Assn. v. Alderson*, 90 Fed. Rep. 142, and Jones on Railroad Securities, § 259, *et seq.*

After a careful consideration of all the authorities cited, we are of opinion that, in administering the affairs of an ordinary insolvent private business corporation for which a receiver has been appointed, a court of equity has not the power to authorize the receiver to incur indebtedness for carrying on the business and to make the same a first and paramount lien upon the *corpus* of the property superior to that of prior lien holders without their consent. While it may, in a proper action, and with the proper parties present, through the instrumentality of a receiver carry on the business of private corporations or individuals temporarily, and incur obligations therefor that may be made a paramount lien on the *corpus* of the property, such obligations must have been contracted for, and must relate strictly to, the preservation of the *status* of the property at the time of the appointment of the receiver. We are not disposed to extend the doctrine established by the federal courts in administering upon insolvent railroad corporations to those of ordinary business corporations.

Appellees, however, insist that, even if the rule which we have just laid down upon the main question in the case is right, still the decree may be upheld upon other principles. And this leads us to a consideration of the various arguments advanced in their support. There are a number of appellees represented by different counsel, not all of whom seek to uphold the decree upon the same grounds; but we shall con-

sider all arguments deemed worthy of notice without indicating by which counsel they are advanced.

1. We have already suggested that, had the character of the action and the presence of the proper parties warranted it, certificates in this case might have been issued for money borrowed to preserve and hold intact the property of the insolvent corporation, which might have been established as liens paramount to that of the prior mortgage had the income been insufficient to discharge them. Such, however, is not this case. While reference in some of the orders is made to the fact that the receiver is permitted to borrow money to preserve the property, it is unquestionably true that the money for which these certificates were issued was borrowed to carry on the business of mining and selling coal, and in no proper sense can it be said that they represent, or were given for, money devoted to the preservation of the property.

2. One of the counsel urges that, under the equitable doctrine of unjust enrichment, it would be unfair for the bondholders to receive an increment to the property without accounting to those who made it. How this contention can be made is utterly beyond our comprehension. The facts abundantly show that, instead of any enrichment accruing to the property in which the bondholders were interested, directly the opposite occurred, since many thousands of tons of coal were taken from their property which, to that extent, was depreciated in value, and in the operation of mining an indebtedness was incurred over and above the profits reaching into thousands of dollars. Whatever may be the doctrine sought to be enforced, the facts of this case do not call for its application.

3. The principal ground relied upon by one of the counsel for the appellees, and which, in our judgment, is the only one worthy of serious consideration, is that, because of the conduct of the bondholders and their trustee, they are now estopped to complain. It will be observed that, in the suit by the bank, neither the trustee nor any of the bondholders was by the plaintiff made a party. ·Indeed, no cause of action

whatever was stated against either the trustee or the bond-holders, and no relief was sought that in any wise could injuriously affect them. The subsequent order of the court, at the request of the receiver, by which the trustee was brought in, was erroneous, and cannot operate in any way to its injury or that of the *cestuis que trustent.* During the receivership of Brooks it appears that he filed various petitions in the court stating that an indebtedness of about $80,000 had been incurred by the United Coal Company before he was appointed receiver, mainly for labor and supplies. These creditors were clamorous for payment, and threatened seriously to interfere with the successful operation of the properties unless their claims were liquidated. The receiver, therefore, asked the permission of the court to borrow money, issue receiver's certificates therefor, and have them made a first and paramount lien upon the *corpus* of the property, and he gave notice to the trustee and some of the bondholders who could easily be reached of his intention to apply for this authority. The trustee and bondholders notified appeared and, while not objecting to the borrowing of money provided it was to be paid out of the profits of the business, strenuously objected thereto if it was to be made a lien superior to theirs. The court permitted the borrowing of the money, but made the debt thus contracted subject to all prior liens, and during the entire receivership of Brooks, upon successive applications made for the borrowing of money for various purposes, the court uniformly in its numerous orders expressly made the indebtedness to be incurred subject to the prior liens.

After Mr. Bishop was appointed receiver in place of Brooks, resigned, upon his representation that the International Trust Company was a proper party, the court made it a party—which ruling was unauthorized—and ordered it brought in, and after this order was made, and Bishop filed a petition asking leave to borrow money and issue receiver's certificates to be a first lien, a notice of the application was served upon the International Trust Company, and it appeared by counsel and objected thereto; but the court, notwithstanding this objec-

tion, permitted certificates to be issued and made them a lien upon the *corpus* of the property superior to that of the mortgage.

This was the first action upon the part of the court, and constituted the only order antecedent to the final decree, in which the prior security was injuriously affected. This money which Bishop desired to borrow was applied in liquidating indebtedness incurred by his predecessor Brooks, and which, in large part, resulted from the payment by Brooks of the $80,000 due to miners and others before the bank suit was started; and at the time Brooks obtained permission to raise the money, the order granting it specified that prior liens were not to be impaired.

After the Trust Company brought its suit to foreclose the mortgage, and upon its consolidation with the bank suit, the court expressly reserved for future consideration the relative ranking of the indebtedness incurred by the two receivers with that represented by the mortgage bonds. It is said by counsel that the Trust Company and some of the bondholders not only knew that a receiver had been appointed in the bank suit, but that he was conducting the business of the United Coal Company in the ordinary way, and made no objection to it; and that, therefore, in the absence of an objection, or upon the failure of the trustee to bring a suit to foreclose the mortgage, it and its *cestuis que trustent* must now be held estopped to question the order of the court which subordinated their lien to that of innocent parties who advanced money, performed labor, and furnished supplies, upon the faith of the acquiescence by the representative of the bondholders in the receivership proceedings.

To this we reply that there is no evidence at all that the holders of these certificates were in any way misled by, or were influenced to act upon, the conduct of the bondholders or their trustee. They were charged with notice of the mortgage, because it was recorded long before the receiver was appointed. They also were advised that all of the indebtedness incurred by Brooks,—which comprised the larger part

now in controversy as having been contracted by Bishop, and is really the same debt in a new form,—was incurred under an order of the court which specifically made it inferior to the lien of the mortgage. The fact that subsequently the certificates issued by Bishop were made superior to the mortgage lien in no wise affects the question now before us; and when it is considered that the court reserved to itself the right to determine the rank of the liens in the final decree, it cannot be said that certificate holders relied upon acquiescence or consent of prior lien holders, or that the appellant, as the representative of the bondholders, is either estopped, or has acquiesed in, or has been negligent in asserting their right and protesting against the subordination of the mortgage lien; particularly when it promptly objected to the action of the trial court, and has diligently prosecuted an appeal from its judgment.

It was not encumbent upon the mortgagee to foreclose the mortgage at any particular time. It might select the forum and the time for that purpose, and merely because it took no active steps to intervene in the suit of the unsecured creditor, when considered in the light of the character of that suit, should not operate to displace its prior vested right. Indeed, the bondholders had a right to suppose, and nothing occurred to make them think otherwise, that the expenses of the receivership were to be paid out of the profits of the business, and the first orders of the court confirmed them in this supposition; and whenever there was an occasion, either in response to a notice to appear in answer to a petition of the receivers, or in private conversation, they all objected to any action that in any wise impaired their prior lien.

It may be, and is unfortunate that the holders of these certificates are to lose their money, because it is conceded that there was realized at the foreclosure sale much less than the amount of the bonds; but so, also, would it be a greater hardship upon, and a flagrant injustice to, the persons who advanced their money to the company, the common debtor, and prudently took a prior lien upon its property, to have

their rights subordinated to obligations subsequently incurred in carrying on the business of the company by receivers who were appointed to manage the property so as to get something for junior creditors.

It is said moreover, and authorities are cited to that effect, that a trustee of a mortgage represents the bondholders, and even though the latter are not actual parties to a suit, what binds the trustee binds the bondholders. We have no disposition to question this doctrine when fairly applied, but it is wholly foreign to the facts of this case. In a suit brought by the trustee of a mortgage to foreclose the same, or when he is in court as a party defending the validity of bonds or protecting the interests of his beneficiaries, or when his action is within the scope of the power as defined by the instrument creating the trust relation, the doctrine is applicable. We do not think that in the bank suit the trustee could have bound the bondholders by any action which it took. A case quite in point is *Farmers' Loan & Trust Co. v. Centralia & C. R. Co.*, 96 Fed. Rep. 636. But if such were the case, the trustee (the appellant here) did nothing, by way of consent or otherwise, that would authorize the court to subordinate the lien of the mortgage. We repeat that, on every occasion when called upon to act, the trustee and the bondholders, so far as this record shows, protested against anything that would give preference over them to persons dealing with the receiver.

In addition to the foregoing considerations, it is important to bear in mind that almost the entire indebtedness incurred by the receivers in carrying on the business under the orders of the court grew out of the operation of the southern properties, none of which was included in the mortgage. The only interest which the United Coal Company had in these properties was a lease which gave it the right to mine coal, but in no circumstances were the bondholders interested in that venture. If any profit was realized from the operation of the southern properties, the bondholders got no benefit from it, and if any losses occurred, it is difficult to conceive

why the same should be saddled upon them. They never consented to the act of the United Coal Company in acquiring these leasehold interests, and even if there was a clause in the mortgage providing that after-acquired property should be subject to its provisions, the bondholders could not, against their wish, be compelled to accept these leasehold interests, nor should they, in the bank receivership case, be compelled to pay the losses sustained in their operation.

The injustice of the decree of the lower court will again be more clearly perceived when it is stated that, before the decree of foreclosure was entered and the sale of the mortgaged property made, all interest which the United Coal Company had in the Oak Creek and Peerless mines was disposed of under the orders of the court, or relinquished by the bondholders' receiver; and so whatever value, if any, these leasehold interests represented which, under some possible contingency, might have been realized by the bondholders through a foreclosure sale, was entirely lost to them. Notwithstanding that fact, they are sought to be taxed with the cost of operating property in which they never had any interest, to which they made no claim, and from which no conceivable advantage could accrue to them.

The additional point is made that the German National Bank has the right of contribution from the other bondholders, to which the certificate holders claim the right of subrogation. The argument is that the majority of the bondholders neglected to foreclose, and the German National Bank, as the pledgee of certain of the bonds, for the purpose of protecting its interests as a bondholder, was obliged to step in to preserve the property for the mortgagee, and that, in equity, the minority bondholders were entitled to a contribution from the majority for the expense of the receivership. The fault in this argument is that the premise is not true. As we have already said, the object of the German National Bank was not to protect the bondholders, or to preserve the property covered by the mortgage, but to prevent the alienation of certain other property subsequently acquired

by the mortgagor to which the unsecured creditors, if they realized anything at all, must resort for the satisfaction of their claims.

The case in a nutshell, is this : A mortgagor to secure its indebtedness gives a mortgage on its property.   Afterwards it acquires other property to which the lien of the mortgage does not attach, and, in conducting its business, it incurs other indebtedness which is unsecured.   The unsecured creditor brings a suit to prevent the mortgagor from disposing of the subsequently acquired unincumbered property, which if it was allowed to  do, would prevent its subjection to a judgment sought to be recovered upon the unsecured indebtedness.   A receiver is appointed to take charge of all the property, both that covered by, and that free from, the mortgage, to the end that something may be saved for junior creditors.   In carrying on the business, losses are sustained, a large part of which results from managing and operating the property not covered by the mortgage.   These expenses of administration are sought to be charged against the mortgaged property and made a lien superior to that of the mortgage.

The mere statement of the case, it seems to us, shows the injustice of this attempted perversion of a benign principle of equity which has no application whatever to the facts of the case in hand.

An argument is made in one of the briefs that the court is bound, under the well established rule of appellate courts, by the findings of fact made by the trial court, among which, it is said, were : that it was necessary that those properties should be operated as a whole ; that it was for the best interests of the bondholders, as well as of the unsecured creditors, that the business of coal mining should be carried on in the usual way to the end that the unsecured, as well as the secured, creditors of the United Coal Company should be paid ; and that it was necessary to the preservation of the entire property that the business should be carried on as it was before the receiver took possession.

We find no justification in the facts of this record to sustain any such findings of fact, if any such were made. Indeed, there are no facts at all upon which such a conclusion can be reached. While we are mindful of the many perplexing questions which arose in this case, and though the intention of the trial court was to deal justly by these parties, and every endeavor was put forth to bring order out of chaos and make of the business a paying one, nevertheless the results are the strongest argument against such attempts by courts of equity to conduct the business of an ordinary private corporation in which the corporation itself has signally failed. It is but another unfortunate experiment unwisely undertaken by a court of equity to do that which business men are unable themselves successfully to accomplish, and the disastrous results of the experiment furnish a convincing argument against the extension to ordinary commercial corporations of the modern doctrine which has grown up out of the necessities of the case when the properties of insolvent railroad corporations have been foisted upon the federal courts by importunate bondholders who are compelled to resort to them to foreclose their mortgages and preserve the security of their liens. In such cases, it can readily be understood, when the bondholders themselves invoke the extraordinary powers of a court of equity, why they should be compelled to pay the expenses of preserving the property which, in the case of a railroad company, can only be done by continuing to carry on its business, and, if necessary, to have the expenses thereof impressed as a lien upon the *corpus* of the property, if the profits of the business are inadequate. No reason exists for the application of such doctrine to the case of an ordinary private business corporation.

There may be cases where a purely private business enterprise may be conducted by a court of equity temporarily, because that may be the only way to preserve the *status* of the property, but such is not the case before us, and there are no facts present in this record to justify a court, in the exercise of its equitable powers, in subordinating the lien of this

mortgage to the claims of those who hold the receiver's certificates.

The decree of the district court, in so far as it establishes the claims of the appellees as a first and paramount lien upon the *corpus* of the mortgaged property, must be reversed, and the cause remanded with instructions to establish the mortgage as a paramount lien thereto, and to modify the decree to conform to the views herein expressed, and, as thus modified, the decree to stand.

*Modified and affirmed.*