VAN VALKENBURGH v. FORD et al.
(No. 7527.)

(Court of Civil Appeals of Texas.   Galveston.
Nov. 14, 1918.   On Motion for Re-
hearing, Dec. 23, 1918.)

1. VENDOR AND PURCHASER ⊕═89 — RESCIS-
   SION BY VENDOR—VENDOR'S LIEN—SALE OF
   LIEN NOTE.
   Vendor, by selling one of his lien notes,
loses the right to rescind the sale.

2. RECEIVERS ⊕═125 — RECEIVER'S CERTIFI-
   CATES—ISSUANCE.
   Holder of vendor's lien on property being
operated by receiver, not having been made a
party to receivership proceedings at the time
receiver's certificates were issued, and having
no notice of issuance thereof, may attack the
necessity and wisdom of issuance of such cer-
tificates upon subsequently being made party.

3. RECEIVERS ⊕═117 — RECEIVER'S CERTIFI-
   CATES—POWER TO ISSUE.
   Court's power to issue receiver's certifi-
cates to become a superior lien to the displace-
ment of prior mortgage liens is not an arbi-
trary, capricious one, but can be resorted to
only in the exercise of sound judicial discretion.

4. RECEIVERS ⊕═128 — RECEIVER'S CERTIFI-
   CATES — NOTICE TO PRIOR LIENHOLDERS —
   PRIORITY.
   Receiver's certificates improvidently issued,
without notice to prior lienholders, and with-
out hearing, will not be given priority as
against prior incumbrances or liens, where such
improvidence is made to appear on a full hear-
ing.

5. RECEIVERS ⊕═118 — RECEIVER'S CERTIFI-
   CATES—NECESSITY FOR ISSUE.
   Where ice and light plant during its eight
years of existence had never been a success, had
been idle much of the time, had competing light
plant serving more customers in town of 2,000
population, and during eight months of opera-
tion by receiver had continually lost money, so
that at end of such time the plant had entirely
consumed itself, the issue of receiver's certifi-
cates as superior lien on property was improvi-
dent and an abuse of discretion.

6. RECEIVERS ⊕═128 — RECEIVER'S CERTIFI-
   CATES—VENDOR'S LIEN—PRIORITY.
   Receiver's certificates improvidently issued,
and made superior lien on property, issued with-
out making prior lienholders parties to the re-
ceivership proceedings, will not be given priority
over prior liens, where holder of receiver's cer-
tificates was stockholder and treasurer of the
company when property was being administered
by receiver, and must have had full knowledge
of hopeless financial condition and impractica-
bility of operation at a profit.

7. RECEIVERS ⊕═118 — RECEIVER'S CERTIFI-
   CATES—POWER TO AUTHORIZE ISSUE—ORIG-
   INAL CONSTRUCTION.
   Court had no power to authorize issuance of
receiver's certificates for original construction
of plant.

8. RECEIVERS ⊕═118 — RECEIVER'S CERTIFI-
   CATES—POWER TO ISSUE — QUASI PUBLIC
   CORPORATION.
   In the operation of a quasi public corpora-
tion the court, in the exercise of a sound discre-

tion, may authorize the issuance of receiver's
certificates for operating expenses, even to the
displacement of prior mortgage liens, but has no
such power, except under the doctrine of estop-
pel, where the corporation in the hands of the
receiver is a private corporation.

9. CORPORATIONS ⊕═8—"QUASI PUBLIC COR-
   PORATION"—ICE COMPANY.
   An ice company, lacking the power of emi-
nent domain, and not being subject to regulation
by public, is a private, and not a quasi public,
corporation.
   [Ed. Note.—For other definitions, see Words
and Phrases, First and Second Series, Quasi
Public Corporation.]

10. EMINENT DOMAIN ⊕═10(1) — ICE COM-
    PANY.
    An ice company has no power of eminent do-
main.

11. CORPORATIONS ⊕═394 — REGULATION —
    ICE COMPANY.
    The public has no regulatory interest in an
ice company.

12. RECEIVERS ⊕═128 — RECEIVER'S CERTIFI-
    CATES—NECESSITY FOR ISSUE.
    The power to displace prior liens, and thus
to impair the force of contracts, is such an ex-
traordinary one, that, in order to call into ex-
ercise such power, the facts justifying it should
be clear and unequivocal.

13. RECEIVERS ⊕═119 — RECEIVER'S CERTIFI-
    CATES—"QUASI PUBLIC CORPORATION."
    A corporation, to justify issuance of receiv-
er's certificates on ground that it is a quasi
public corporation, must be actually quasi pub-
lic, and not merely potentially so, and must sub-
serve some appreciable service to the public,
and to some reasonable extent meet a public de-
mand and necessity.

14. RECEIVERS ⊕═119 — RECEIVER'S CERTIFI-
    CATES—POWER TO ISSUE — QUASI PUBLIC
    CORPORATION—ICE PLANT.
    An ice and light plant, whose average
monthly income from ice department during the
eight months under receivership was $451.33,
and whose monthly average income from the
light department was only $79.61, will not be
deemed a quasi public corporation for purposes
of issuing receiver's certificates, the dominant
pursuit of such corporation being the furnish-
ing of ice.

15. EMINENT DOMAIN ⊕═8—GRANT OF POW-
    ER—CONSTRUCTION.
    Acts conferring the power of eminent do-
main will be strictly construed.

16. EMINENT DOMAIN ⊕═10(1)—QUASI PUB-
    LIC CORPORATIONS.
    Ordinarily it is essential for quasi public
service corporations to have the power of emi-
nent domain.

17. RECEIVERS ⊕═128 — RECEIVER'S CERTIFI-
    CATES—VENDOR'S LIEN—COSTS OF RECEIVER-
    SHIP.
    Where vendor retained title to secure pay-
ment of purchase money, and subsequently
brought action against vendee on purchase-mon-
ey notes, his vendor's lien is superior to the
costs incurred in the receivership of property
of corporation organized by vendee, where he
was not made party to receivership proceedings,
though his action, to which corporation was not

⊕═For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

a party, was finally consolidated with receivership proceedings.

**18. EMINENT DOMAIN ⬤➡11—INDIVIDUALS.**

Individuals have no right of eminent domain.

**19. EMINENT DOMAIN ⬤➡6—DELEGATION OF POWER.**

The state has a right to part with its sovereign power of eminent domain to such agencies as it deems proper.

**20. EMINENT DOMAIN ⬤➡10(1)—LIGHT COMPANIES—INDIVIDUALS.**

Under Vernon's Sayles' Ann. Civ. St. 1914, art. 1283d, individuals operating light companies have no power of eminent domain.

**21. RECEIVERS ⬤➡128 — RECEIVER'S CERTIFICATES—PRIORITY—VENDOR'S LIEN.**

Where idle and stagnant ice and light plant was sold by individual, subject to vendor's lien, to one who subsequently organized corporation with quasi public incidents to operate plant, the character of the corporation, upon plant passing into hands of receiver, did not destroy priority of vendor's lien as to receiver's certificates.

**22. RECEIVERS ⬤➡128—RECEIVER'S CERTIFICATES—VENDOR'S LIEN—PRIORITY.**

Holder of improvidently issued receiver's certificates, who was stockholder and who secured issuance of certificates with understanding that no notice was to be given to creditors, and was chief mover in proceedings to procure certificates, no application therefor being made by creditors, holds certificates subject to prior rights of prior lienholder who was not a party to the proceeding, and who was given no notice thereof.

**23. RECEIVERS ⬤➡154(1)—RECEIVER'S FEES — VENDOR'S LIEN—PRIORITY.**

Vendor's lien is entitled to priority over fees of receiver, his attorney, and master in chancery incurred in receivership proceedings of corporation organized by vendee, where vendor was not a party thereto until his action against vendee on purchase-money notes, in which corporation was not a party, was consolidated with receivership proceedings without consent of vendor, and where such fees were incurred before vendor was made a party.

**24. RECEIVERS ⬤➡154(1) — FEES — CHATTEL MORTGAGES—PRIORITY — VOLUNTARY APPEARANCE IN RECEIVERSHIP PROCEEDINGS.**

Fees of receiver, his attorney, and master in chancery are superior to chattel mortgage liens on property in receivership, where holders of such liens intervened in receivership proceedings, and voluntarily used such proceedings for collection of their debts.

**25. FIXTURES ⬤➡7 — MACHINERY — CONCRETE FOUNDATION.**

Thirty thousand pound engine, imbedded in 6 feet deep by 4 feet long concrete foundation 1½ inch in diameter, bolts, covered with concrete, became, as a matter of law, a part of the realty by reason of method of attachment and impossibility of removal without injury to real estate.

**26. FIXTURES ⬤➡21 — VENDOR'S LIEN—INSTALLATION OF NEW MACHINERY.**

Where vendor sells plant with machinery located thereon subject to vendor's lien, and machinery is subsequently removed and new machinery installed, the new machinery takes the place of the old machinery, and becomes subject to the lien, on the ground that depreciation of vendor's security will not be permitted.

**27. FIXTURES ⬤➡21—VENDOR'S LIEN — INSTALLATION OF NEW MACHINERY—CHATTEL MORTGAGE—PRIORITY.**

Where machinery composing part of plant sold by vendor subject to vendor's lien is replaced by new machinery, consisting of 30,000-pound engine, which was embedded in concrete foundation 6 feet deep and attached to foundation by iron bolts 4 feet long, the vendor's lien was entitled to priority over chattel mortgage on such engine.

**28. FIXTURES ⬤➡21—VENDOR'S LIEN—CHATTEL MORTGAGE—PRIORITY.**

A chattel mortgage on electric exciter, sold to corporation operating plant subject to vendor's lien, was entitled to priority over vendor's lien, where it was not attached to the realty in such manner as to constitute it a fixture.

Appeal from District Court, Brazoria County; Sam'l J. Styles, Judge.

Action by Charles G. Mugler against the Mugler Manufacturing Company, in which Mrs. Gay Ford, the Muncie Oil Engine Company, the Mercantile Trust Company of Illinois, the Southwest General Electric Company, and others intervened, consolidated with action by R. W. Van Valkenburgh against Charles G. Mugler and others. The lower court rendered judgment subordinating the vendor's lien on the real estate held by Van Valkenburgh, and the chattel mortgage liens held on certain machinery by the machinery interveners, to receiver's certificates issued and to the costs of the receivership, from which said Van Valkenburgh and the machinery interveners appealed. The court at the same time rendered judgment in favor of the machinery interveners against the said Van Valkenburgh, holding the chattel mortgage liens on the respective machinery sold by said interveners to the Mugler Manufacturing Company were superior to Van Valkenburgh's vendor's lien on the real estate and plant, from which judgment the said Van Valkenburgh appealed. Both judgments reversed and rendered in part, and affirmed in part.

Thompson, Knight, Baker & Harris, of Dallas, Munson & Williams, of Angleton, Cole & Cole, of Houston, and G. W. Follin, of Bell Buckle, Tenn., for appellant Van Valkenburgh.

Elliot Cage, of Houston, for appellant Muncie Oil Engine Co.

George A. Byers, of Houston, for appellant Mercantile Trust Co. of Illinois.

A. R. Rucks, of Angleton, for appellant Southwest General Electric Co.

John Charles Harris and Harris & Harris, all of Houston, and C. D. Jessup and W. S. Sproles, both of Angleton, for appellee Ford.

⬤➡For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

LANE, J. Prior to May, 1913, the Alvin Water, Light & Ice Company, whether a corporation or copartnership not shown by the record, was the owner of lots 2 and 3, in block 2, in the A. C. Wade addition to the town of Alvin, Brazoria county, Tex., together with all buildings, fixtures, machinery, etc., placed or built thereon as a part of its water, light and ice plant, and also all poles, wires, and fixtures constructed, in connection therewith, upon and along the streets of Alvin. The above-named company becoming insolvent, all of the property above described was sold under execution sale to appellant R. W. Van Valkenburgh on the 16th day of May, 1913.

Van Valkenburgh was the owner of this property from the date of its purchase up to the 5th day of January, 1915, a period of about 20 months. During the 20 months he owned said "plant" and property the plant was only operated for about five months, and during the eight months next preceding his disposition of the same, on January 5, 1915, it was not operated by any one. On January 5, 1915, Van Valkenburgh, by his deed of that date, conditionally conveyed all of said property to one Charles G. Mugler for a consideration of $5,500, of which $1,000 was paid by Mugler in cash. For the remainder Mugler executed four notes for $1,000 each and one for $500, all being payable to R. W. Van Valkenburgh or order, 9, 15, 20, 24, and 30 months, respectively, from their dates. Said deed contained a clause as follows:

"But it is expressly agreed and stipulated that the vendor's lien is retained against the above-described property, premises, and improvements until the above-described notes, and all interest thereon, are fully paid according to their face and tenor, effect, and reading, when this deed shall become absolute."

The first of the series of $1,000 notes was transferred by R. W. Van Valkenburgh to Harry Ford, a son of James and Gay Ford, hereinafter mentioned, with an indorsement thereon to the effect that as a lien against the property sold by Van Valkenburgh to Mugler it was to be secondary and subordinate to the other notes retained by Van Valkenburgh.

On the 14th day of April, 1915, three months and ten days after Mugler bought the "plant" from Van Valkenburgh, he (Mugler), one James Ford, and his wife, Gay Ford, procured the issuance of a charter incorporating the Mugler Manufacturing Company, with Charles G. Mugler, James Ford, and Gay Ford as organizers and directors. The purposes for which the company was incorporated were expressed in its charter as follows: "The manufacture of and supply of ice to the public, and the generation of a supply of gas, electric light, and motor power to the public." The capital stock was $12,000, all paid as follows: $6,000 by Mugler, by his promise to convey to said corporation property conveyed to him by Van Valkenburgh; $5,900 cash, paid by James Ford; and $100 cash paid by Gay Ford. Mugler never did convey said property to the corporation, but his affidavit made to procure the issuance of the charter is to the effect that he had conveyed the same to said corporation. Mugler was the owner of $6,000, James Ford $5,900, and Gay Ford $100 worth of the stock of said corporation, respectively. The corporation thus formed commenced business with Charles G. Mugler as president, James Ford as secretary, and Mrs. Gay Ford as treasurer, and shortly after the incorporation of said company it incurred a large indebtedness for machinery and material bought for the purpose of commencing operations, as the plant was not in operation at the date of its sale by Van Valkenburgh to Mugler, and, as before stated, had not been for eight months next prior to such sale.

After the incorporation of said company, on April 14, 1915, and after the plant was overhauled and new engines and other machinery were installed, which we assume consumed some considerable time, the corporation began the operation of the plant. After operating the plant for a few months only, Charles G. Mugler, president of the corporation, on October 27, 1915, filed his suit No. 11,204 in the district court of Brazoria county against said corporation, the Mugler Manufacturing Company, and in his petition he alleged the organization and incorporation of the company; that he was president of the company, and the owner of one-half of the capital stock; that he was the active manager of the business and plant of the Mugler Manufacturing Company; that the assets of defendant corporation consisted of real estate, electric light and ice manufacturing plant, electric light poles, and lines and fixtures incident thereto (together with a small amount of bills receivable), of the approximate value of $22,300; that the liability of said corporation aggregated approximately $23,250; that he had advanced $6,000 to the company, and that the company was also further indebted to him for $300 for borrowed money and $900 for past salary due him as president and manager; that said corporation was in eminent danger of insolvency, and that the interest and welfare of the stockholders and of the public rendered it necessary that a receiver should be appointed immediately.

Upon this petition one A. T. Page was by the court appointed receiver of the properties of the corporation on the 28th day of October, 1915, and on the same day duly qualified as such. On October 30, 1915, two days after his appointment and qualification, said receiver filed his petition, praying that he be permitted to operate said plant, setting forth the fact that the company had no funds to

defray the expenses of operating the same, and prayed that he be authorized to issue receiver's certificates to defray said expenses; and at various and sundry times, upon the application of the receiver, he was authorized to issue receiver's certificates to defray the expenses of operation, and for improving and adding to the plant, until he had issued certificates aggregating $3,500, which by order of the court were made prior and superior liens on all of the assets of the corporation over every other class of claims, including the vendor's lien notes held by Van Valkenburgh and Harry Ford.

Certificate No. 1 was issued October 26, 1915, for the sum of $500; certificates Nos. 2 and 3, for the sum of $500 each, were issued in favor of Harry Ford on the 25th day of November, 1915; certificates Nos. 4 and 5, for the sum of $500 each, were issued on the 25th day of November, 1915, in favor of Mrs. Gay Ford; and certificate No. 6, for the sum of $1,000, was issued on the 7th day of April, 1917, in favor of Mrs. Gay Ford; all aggregating the sum of $3,500. By transfer and otherwise all became the property of Mrs. Gay Ford, and were owned and held by her at the time of the trial of this cause.

At the time the receiver was appointed upon the petition of Charles G. Mugler, president of the corporation, James Ford, husband of Mrs. Gay Ford, and father of Harry Ford, had an investment in the plant of some eight or ten thousand dollars.. After the receiver took charge of the properties, Harry Ford stayed at the plant for a month and a half, and assisted in its management, when he was called north on account of his father's death. The Fords agreed with the receiver to buy the receiver's certificates when the court authorized their issuance, in order to keep the business running. The Fords were familiar with the character of the business done by the plant, and knew that the principal business of the company was the manufacture and sale of ice, and knew that a much larger portion of the money secured by the issuance and sale of said receiver's certificates was to be used in the manufacture of ice, and that a very small portion thereof was to be used in furnishing light to the public.

The Mugler Manufacturing Company, by its officers and directors, James Ford and Mrs. Gay Ford, answered the suit of Mugler, and, after alleging its incorporation, further alleged that plaintiff Charles G. Mugler had subscribed for one-half of the total capital stock of the company, to wit, $6,000 worth, and had promised to convey the property purchased by him from Van Valkenburgh to the company in payment for his said stock and that, to procure the charter incorporating the company, he made an affidavit that he had so conveyed said property; that, regardless of such promise and affidavit, he (Mugler) had never so conveyed said property. It

further alleged that the $6,000 then sued for by Mugler was the $6,000 paid into the treasury by James Ford and Gay Ford in payment of capital stock of the company purchased by them, which they alleged was appropriated by Mugler to his own use and benefit. Its prayer was for judgment against Charles G. Mugler (1) to compel him to execute and deliver to it a deed conveying the property hereinafter mentioned; (2) for a sum equal to the unpaid purchase money owing by him to R. W. Van Valkenburgh and others, constituting a vendor's lien on said above-described property; and (3) for $6,000 for the money of the company appropriated by him to his own use.

On December 2, 1915, James Ford, Gay Ford, and Harry Ford intervened in the suit of Charles G. Mugler v. Mugler Manufacturing Company, and in their petition they make practically the same allegations of wrongdoing by Charles G. Mugler as is alleged in the answer of the Mugler Manufacturing Company.

Harry Ford, by way of cross-action, asks judgment against Mugler upon the aforementioned $1,000 note transferred to him by Van Valkenburgh, and upon a $1,000 note transferred to him by the Muncie Oil Engine Company.

It is further alleged in said petition that the capital stock of said corporation is owned and held as follows:

| | |
|---|---|
| Charles G. Mugler | $ 6,000 00 |
| James Ford | 100 00 |
| Mrs. Gay Ford | 100 00 |
| Harry Ford | 5,800 00 |
| Total | $12,000 00 |

It is further alleged, among other things, "that after the organization of the Mugler Manufacturing Company, and the election by the board of directors of plaintiff Charles G. Mugler as president and general manager, interveners James Ford and Gay Ford removed, on account of the health of James Ford, from Galveston, Galveston county, Tex., to Syracuse, Kan., and left the plaintiff Charles G. Mugler as president and general manager in sole and exclusive management of the plant and business of the Mugler Manufacturing Company, these interveners at that time reposing every trust and confidence in the said Mugler.

And these interveners further allege that—

"the said plaintiff Charles G. Mugler as president and general manager in sole and exclusive charge of the business of the Mugler Manufacturing Company, from the time of its charter, to wit, about April 15, 1915, until the receiver qualified and took possession of said plant, on, to wit, about October 30, 1915, never was able to put the plant upon a paying basis, but has run the plant heavily in debt, the extent of which these interveners are not advised, because the said Charles G. Mugler has always refused these interveners 'any right to examine or

audit the books, papers, vouchers, and accounts of the Mugler Manufacturing Company, and that the said plaintiff Mugler has borrowed, on behalf of the Mugler Manufacturing Company, from intervener James Ford, a large sum of money, to wit, the sum of four thousand dollars ($4,000), which intervener James Ford has loaned the Mugler Manufacturing Company, to try to keep the same a going concern; and the said Mugler has further neglected, failed, and refused to pay off the vendor's lien notes held by R. W. Van Valkenburgh, who resides in Dallas, Dallas county, Tex., one of said notes as hereinbefore set forth being also held and owned by intervener Harry Ford, which vendor's lien notes are the personal debt of the plaintiff Charles G. Mugler, and are not now, and never have been, the debt or obligation of the Mugler Manufacturing Company."

Their prayer was, first, for judgment against the Mugler Manufacturing Company for $4,000 in favor of the Fords for money loaned by James Ford to said company in his effort to keep the plant going; second, for judgment in favor of Harry Ford for $1,000 against the Mugler Manufacturing Company and Charles G. Mugler upon a $1,000 note executed by the company to the Muncie Oil Engine Company, and by it transferred to Harry Ford, for a foreclosure of a lien on certain engines installed in the plant of the company, and for their removal and sale to satisfy such judgment; third, for judgment in favor of Harry Ford upon the said $1,000 vendor's lien note against Charles G. Mugler, and for foreclosure of the vendor's lien upon the real estate conveyed by R. W. Van Valkenburgh to said Mugler.

For many years prior to and at the time of the appointment of the receiver of the properties of the Mugler Manufacturing Company, and during the time its light and ice plant was operated by the receiver upon funds procured by the issuance and sale of $3,500 of receiver's certificates, there was in operation in the town of Alvin, a town of about 2,000 people, a competitive light, water, and ice plant owned and operated by the Alvin Light & Power Company, which had, during the eight months in which the Mugler plant was being operated by the receiver, about 200 light consumers in the town of Alvin. It also had a contract with said town to furnish the street lighting, and with the G., C. & S. F. Ry. Co., the only railway running to or passing through said town, to furnish its station with lights. This plant from the time of the appointment of the receiver for the Mugler plant, and during the time the receiver operated same, had what is known as a direct current system only. It had an alternating current, but it had burned out and had not been replaced. The Mugler plant had what is known as an alternating current, which it installed in May, 1915. Up to the time the receiver was appointed the Mugler Company had about 58 light consumers in the residential portion of the town

of 2,000 inhabitants, and during the time it was operated by the receiver its largest number of light consumers at any time was 85.

"The only advantage of an alternating current over a direct current for lighting purposes is this: You can give service practically an unlimited distance with an alternating current, and you cannot with a direct current; three miles is practically the limit for a direct current."

The receiver operated the plant of the Mugler Manufacturing Company during the months of November and December, 1915, and during the months of January, February, March, April, May, and June, 1916, eight months in all. The gross incomes from the sale of both lights and ice during said operation is shown by the following table:

|  | Light Sales. | Ice Sales. |
|---|---|---|
| First month | $ 60 25 | $ 235 16 |
| Second month | 70 50 | 216 32 |
| Third month | 64 05 | 117 34 |
| Fourth month | 65 90 | 139 57 |
| Fifth month | 75 90 | 290 77 |
| Sixth month | 80 50 | 366 36 |
| Seventh month | 112 75 | 924 88 |
| Eighth month | 107 85 | 1,145 14 |
|  | $637 70 | $3,611 44 |

It is thus shown that the total income for the eight months, for both light and ice, aggregated the gross sum of $4,249.14, and the total expense for said months, to operate both light and ice departments of the plant, amounted to the gross sum of $7,291.85. A fair apportionment of the expenses of the two different departments would be $300 per month to run the light plant, or the sum of $2,400 for said eight months. It would cost to run the light plant, exclusive of the ice department, about $375 per month, exclusive of any court costs in the case.

After the receiver had been appointed, and after he had operated the plant for about eight months, and sold the receiver's certificates hereinbefore mentioned, the Muncie Oil Engine Company, the Mercantile Trust Company, and the Southwest General Electric Company intervened in the cause, alleging the sale by them, respectively, of certain machinery to the Mugler Manufacturing Company, upon which they retained liens to secure payment of the purchase money therefor, and praying for judgments and a foreclosure of the respective liens upon the properties sold by them.

Other unsecured creditors of said company intervened, whom it is not necessary to specifically mention here.

The appointment of the receiver, and the issuance of and sale of the receiver's certificates, before mentioned, was upon ex parte application of Charles G. Mugler and A. T. Page, receiver without notice, to any of the interveners or other creditors, and without their consent.

The appellant Van Valkenburgh, subse-

quent to the receivership proceeding, and about a year thereafter, on, to wit, August 17, 1916, brought an independent suit, being cause No. 11,728, in the district court of Brazoria county, in which he sued Charles G. Mugler, his vendee, and made A. T. Page, as receiver of the Mugler Manufacturing Company, a party, alleging that the said Page claimed some interest in the property, and also made the Muncie Oil Engine Company, the Mercantile Trust Company of Illinois, and the Southwest General Electric Company parties, they holding certain chattel mortgage liens on machinery sold to the Mugler Manufacturing Company, and the said Van Valkenburgh also made Harry Ford a party, in which suit he sought a judgment against Charles G. Mugler on three of the vendor's lien notes for $1,000 each, and on one for $500, he having in the meantime sold the first maturing $1,000 note to Harry Ford, without recourse, and with the reservation of the said Van Valkenburgh's superior rights as a vendor for the protection of the remaining notes, which the said Van Valkenburgh retained, the said Van Valkenburgh seeking a foreclosure against all of the parties for the purpose of securing payment of his indebtedness.

Following the filing of said suit by appellant Van Valkenburgh, receiver Page and all the Ford interveners, filed a motion on September 7, 1916, to consolidate the pending cause No. 11,204, Charles G. Mugler v. Mugler Manufacturing Company, with pending suit No. 11,728, R. W. Van Valkenburgh v. Charles G. Mugler et al., alleging as a ground that the said Van Valkenburgh claimed a vendor's lien against the property of the Mugler Manufacturing Company, and that the Fords claimed to have a superior lien by reason of being the owners of said receiver's certificates, the said Van Valkenburgh never having been made a party to the receivership proceedings prior thereto; which motion to consolidate was contested by the said Van Valkenburgh on divers and sundry grounds, but his contest was overruled, and the motion to consolidate was granted, to which the said Van Valkenburgh excepted.

On the 7th day of September, 1916, receiver A. T. Page and the Ford interveners filed a motion in the cause in which they prayed for an order directing the receiver to sell all of the property, real and personal, belonging to the Mugler Manufacturing Company, for a sum not less than $6,500.

On the 25th day of September, 1916, intervener Mrs. Gay Ford filed an additional petition, alleging that she was the owner and holder of all the receiver's certificates issued by the receiver, and praying that she be protected in their purported priority.

On the 28th day of September the trial court heard the motion for the sale of the property, made by the receiver and the Fords,

granted the same, and ordered said property sold free from any and all vendor's liens, chattel mortgages, or other liens of any and every nature whatsoever. Said sale to be for cash, and for not less than $6,500.

Van Valkenburgh being formerly made a party, styling himself as an involuntary intervener, filed his first amended original petition on February 24, 1917, setting up the facts as set up in his original petition, and also, in addition, making the usual and formal allegations in a trespass to try title suit, substituting as his principal prayer for relief a recovery of the property sold to Mugler, and in the alternative an establishment of his debt, and a foreclosure of the vendor's lien as against all of the parties to the receivership proceedings.

In addition to such involuntary intervention by the said Van Valkenburgh, he also filed a contest to the action of the court in having issued the receiver certificates, and also filed an answer to the original intervention of intervener Gay Ford, directly attacking and contesting her claim for superior rights as the holder of said receiver certificates.

The statement heretofore has concerned itself with the facts pertinent to the question of priority between the vendor lien claim of Van Valkenburgh and the chattel mortgage claims of the machinery interveners on the one hand and receiver certificates and court expenses on the other. In addition, contests arose between the said Van Valkenburgh on the one hand and the machinery interveners on the other as to the relative priority on the machinery installed by said interveners in the plant, as between Van Valkenburgh's vendor's lien and their chattel mortgage liens, a special statement in regard to which will follow in the appropriate place in this opinion.

The case came on for trial on March 17, 1917, before the court without a jury, resulting in a judgment allowing $800 to receiver Page, $500 to C. D. Jessup as attorney for the receiver, and $300 to W. S. Sproles for services as master in chancery; in favor of Mrs. Gay Ford for $3,806 as principal and interest on said receiver certificates; $410.31 in favor of the receiver for additional moneys paid out by him; the appellant Van Valkenburgh was denied a recovery of the property, but was given judgment for $4,517 as the then value of his notes; judgments were rendered for Muncie Oil Engine Company for $2,681.56, Mercantile Trust Company for $759, and Southwest General Electric Company for $552.41.

The plant having been ordered sold, the following order of priority in the distribution of the money was entered: (a) All court costs; (b) the payment of the amounts allowed the receiver, his attorney, and the special master; (c) the payment of the receiver cer-

tificates to Mrs. Ford; (d) the payment of $410.31 to the receiver for money spent by him; (e) the payment of Van Valkenburgh, under his vendor lien, out of the proceeds of the plant, other than the machinery on which the interveners held chattel mortgages; (f) to the payment of the judgments of said machinery interveners out of any money left from the proceeds of the separate sale of the machinery, after prorating such proceeds to the payment of the debts and costs of receivership, including the certificates; (g) if any money was left out of the sale of this separate machinery, it should then go to Van Valkenburgh.

Judgment having been rendered for the Fords on their unsecured claims against the Mugler Company and in favor of several other unsecured creditors, the right to participate after the foregoing application of the proceeds of the sale was ordered among such unsecured creditors; but as it seems to be apparent that there will not be enough to pay off the above claims, ranked as secured, it will be unnecessary to notice further the rights of unsecured creditors.

R. W. Van Valkenburgh and the machinery interveners have appealed. We will first dispose of the issues arising between appellant Van Valkenburgh and the machinery interveners on the one hand and Mrs. Gay Ford, the holder of the receiver certificates, on the other. We will refer to Van Valkenburgh as the appellant, but in doing so it will be understood, on the issue under review now, that we also intend to include thereby the machinery interveners, Muncie Oil Engine Company, Mercantile Trust Company, and Southwest General Electric Company.

When we refer to appellee on this branch of the case we refer to Mrs. Gay Ford as the holder of the receiver certificates.

The foregoing is a general statement of the case, and more specific statements of fact will be set out under the appropriate assignments.

[1] By appellant's first, second, and third assignments of error he raises the question of his right to recover the land. As has appeared from the foregoing statement, Van Valkenburgh sold one of his vendor lien notes for $1,000 to Harry Ford, and we hold that by doing so he lost his right to rescind the sale of the land. Douglass v. Blount et al., 95 Tex. 369, 67 S. W. 484, 58 L. R. A. 699. It is not perceived by the court that the fact that the sale of such note was without recourse, and subject to superior rights of the said Van Valkenburgh for the security of the notes which he was retaining, changes the principle which was enunciated in the foregoing case. The assignments complaining of the action of the court in refusing relief by way of recovery of the land are overruled.

By the fourth, fifth, sixth, and seventh assignments of error appellant challenges the superiority of the receiver certificates and the expenses of receivership on the ground that the receivership proceedings were improvident, and that the operation of the plant was improvident, and that the certificates should never have been issued.

[2] As shown in the general statement, Van Valkenburgh attacked the issuance of the certificates as soon as he was made a party to the proceedings, and called in question, through direct attack, the necessity and wisdom of ever having issued said certificates. It is settled that Van Valkenburgh had the right to make such attack as soon as he was made a party. Union Trust Co. v. Ry. Co., 117 U. S. 434, 6 Sup. Ct. 809, 29 L. Ed. 963; I. & G. N. Ry. Co. v. Coolidge et al., 26 Tex. Civ. App. 595, 62 S. W. 1097. In these cases it was held that, where the holder of a prior lien is subsequently brought into receivership proceedings, he thereupon has an opportunity to be heard, and that such opportunity is equivalent to prior notice, and that when such prior lienholder is brought in he then has the right to contest the issuance of the certificates.

In Union Trust Co. v. Railway Co., supra, the United States Supreme Court held that the receiver and those lending money to him on certificates issued on orders made without prior notice to parties interested take the risk of the final action of the court in regard to the loans, and in this connection used the following language:

"When such prior lienholders are brought before the court they become entitled, upon the plainest principles of justice and equity, to contest the necessity, validity, effect, and amount of all such certificates, as fully as if such questions were then, for the first time, presented for determination. If it appears that they ought not to have been made a charge upon the property, superior to the lien created by the mortgages, then the contract rights of the prior lienholders must be protected. On the other hand, if it appears that the court did what ought to have been done, even had the trustee and the bondholders been before it when the certificates were authorized to be issued, the property should not be relieved from the charge made upon it, in good faith, for its protection and preservation. Of these rules or principles the parties who inaugurated this litigation cannot justly complain. They were not ignorant of the fact that there were existing mortgages upon this property, and that fact should have been brought to the attention of the court at the very outset."

This case was quoted with approval by this court, through Chief Justice Pleasants, in I. & G. N. Ry. Co. v. Coolidge, supra, wherein it was held that, where the lien of certificates was fixed before appellant intervened, "it was not res adjudicata or binding on the appellant by reason of its failure to sooner except to said order."

The right being clear of appellant to have

attacked the issuance of said certificates as he did, it is thought proper to state our conception of the law which should govern in the issuance of receiver certificates.

In the case of I. & G. N. Ry. Co. v. Coolidge, supra, this court held that while the right to issue certificates by a court administering property and constituting them first liens, for the preservation and management of the property, cannot be questioned, yet it was further held that "such power cannot be arbitrarily exercised." The leading case on which appellee depends for sustaining her priority under these certificates is the case of Ellis v. Water Co., 86 Tex. 109, 23 S. W. 858; but in that case Judge Gaines took pains to say that—

"Whether the action of the court in awarding the certificates was proper in the first instance we have no means of knowing. * * * So far as we are informed by the statement of the case given in the conclusions of fact and the opinion of the Court of Civil Appeals, the applicant for the writ of error does not appear to have objected to the action of the court at any stage of the proceedings until the final decree."

In the case of Kneeland v. American Loan & Trust Co., 136 U. S. 89, 10 Sup. Ct. 950, 34 L. Ed. 379, the United States Supreme Court used this language:

"It is the exception, and not the rule, that such priority of liens can be displaced. We emphasize this fact of the sacredness of the contract liens, for the reason that there seems to be growing an idea that the chancellor, in the exercise of his equitable powers, has unlimited discretion in this matter of the displacement of vested liens."

In Southern R. R. Co. v. Carnegie Steel Co., 176 U. S. 257, 20 Sup. Ct. 347, 44 L. Ed. 458, the Supreme Court used this language:

"It is apparent from an examination of the above cases that the decision in each one depended upon its special facts."

This is repeated on page 292 of 176 U. S., on page 361 of 20 Sup. Ct., on page 473 of 44 L. Ed.:

"Each case, as already observed, must depend largely upon its special facts."

In Iron & Coal Co. v. Farmers' Loan & Trust Co., 176 U. S. 298, 315, 20 Sup. Ct. 363, 369, 44 L. Ed. 475, 484, the Supreme Court used this language:

"The decision in each case has been more or less controlled by special facts."

Among other cases holding that the court should not improvidently issue certificates may be cited. Farmers' L. & T. Co. v. Burbank Power Co. (D. C.) 196 Fed. 539; Ex parte Mitchell, 12 S. C. 83; and Meyer v. Johnston, 53 Ala. 349.

[3, 4] From the foregoing we deduce the rule that each case rests on its own special facts, and that while the court has power to issue certificates which will become a superior lien on the property in receivership, to the displacement of prior mortgage liens, such power is not an arbitrary, capricious one, but can be resorted to only in the exercise of a sound judicial discretion; and that where such certificates are improvidently issued, without notice to such prior lienholders and without a hearing, and where such improvidence is made to appear on a full hearing, the priorities allowed such certificates will not be respected as against such prior incumbrances or liens on the property in receivership.

Guided by the foregoing principles, which we understand to be fully established, it becomes necessary to consider the facts which are asserted by appellant as showing the improvidence of the receivership.

The undisputed evidence showed that the plant had never been a success, and, in its eight years' existence under different ownerships, was idle much of the time, and was never operated at any one time over ten or twelve months without having to shut down; and that the last time it started in operation was subsequent to January 5, 1916, and on October 27th of the same year it went into the hands of a receiver, having incurred some $20,000 indebtedness in the meantime.

The fact findings of the trial judge, which are not excepted to by appellee, further showed these facts:

There was another light plant in the town of Alvin, which supplied 200 light consumers, and that the Mugler plant had less than 58 consumers; that the town of Alvin had a population of about 2,000; that said two plants were competitors, and that the operation of either was a hindrance to the other, as the town was not large enough "to justify the operation of two" such plants; that, without an extension of the poles, wires, and equipment of the Mugler plant, the same was in no condition to operate its light department at a profit; that the total income from the operation of the plant for the eight months, from the light and ice departments, respectively, shown for each respective month, was as follows:

| | Light Sales. | Ice Sales. |
| --- | --- | --- |
| First month | $ 60 25 | $ 235 16 |
| Second month | 70 50 | 216 32 |
| Third month | 64 05 | 117 24 |
| Fourth month | 65 90 | 139 57 |
| Fifth month | 75 90 | 290 77 |
| Sixth month | 80 50 | 366 36 |
| Seventh month | 112 75 | 924 88 |
| Eighth month | 107 85 | 1,145 14 |
| | $637 70 | $3,611 44 |

It is thus shown that from both the ice and light departments the total income was $4,249.14, and the court further found that the total operating expenses for said eight months was $7,291.85, that new construction

cost $1,228.83, and the receiver spent $410.31 additional, showing an aggregate outgo of $8,930.99 to produce an income of $4,249.14, showing a deficit for the eight months operation of $4,681.85, or a monthly average loss of $585.23. If to the foregoing total expenses should be added the $1,600 fees allowed the receiver, his attorney, and master in chancery, the total expenses would be $10,530.99 for the eight months operation, or $6,281.85 more than the total income, to say nothing of the ordinary costs of court.

It further appeared that the receiver and the Ford interveners made a joint application for a sale of all the property of the Mugler Company on September 7, 1916, in which they recommended a sale of all the company's property for $6,500, and secured an order of sale for such amount over Van Valkenburgh's protest, but the record does not disclose that a purchaser was found at such figure.

[5,6] On the foregoing facts we do not think reasonable minds can differ to the effect that the trial court erred in issuing the certificates and making them a superior lien on the property. That the order was improvident, and must be held to be an abuse of discretion, we entertain no doubt. The order was made ex parte, with no hearing whatever, and without any notice to any creditors, and as a result of a private agreement between the Fords and the receiver to the effect that the former would buy the certificates if the latter could secure their issuance as prior liens on the property. Doubtless, if the court had held a hearing when the certificates were originally applied for, and the same facts had developed as were shown on the final hearing on appellant's contest, the certificates would have never been authorized; but it was no fault of appellant that such irregular proceedings were resorted to, as the Fords could have interplead appellant, and given him notice of the application for certificates. The rule that the purchaser of receiver certificates must hold them subject to final action of the court as to prior lienholders who have not but should have been made parties has peculiar application here, where it is shown that appellee, who holds the certificates, was a stockholder in and treasurer of the Mugler Company, and must be held to have had full knowledge of its desperate and hopeless financial condition, and of the impracticability of its operation at a profit.

[7] The court's fact findings show the plant should not have been operated. He finds, as above shown, that the town had two light plants, and was not large enough to justify the operation of two, and that one was a hindrance to the other. Further, that, without additional equipment and extensions, the light plant could not operate at a profit. When it is considered that the court

had no power to issue certificates for original construction (Wood v. Guarantee Trust & S. D. Co., 128 U. S. 416, 9 Sup. Ct. 131, 32 L. Ed. 472; Atlantic Trust Co. v. Dana, 128 Fed. 209, 237, 62 C. C. A. 657), the effect of the finding is that the plant could not operate at a profit without additional construction, with no power on the part of the court to incur indebtedness for such construction. These facts were just as obvious when the certificates were issued as on final hearing.

The receiver and the Fords, in making application for a sale of the property on September 7, 1916, three or four months after they discontinued operation for want of money, reported that with the utmost economy, even during the hot-weather months, when the sale of ice was greatest, they had "been unable to earn the running expenses of said plant," and that "with the coming of fall and winter and cold weather the income of the plant will materially decrease, and that the expenses will remain about the same, and it will be impossible for your receiver to meet the expenses of the plant during the fall and winter months."

From the very inception of the operation by the receiver the plant was steadily losing over $500 a month, and yet in the face of that fact the receiver continued, from time to time, to secure authority to issue certificates, and the Fords continued as regularly to buy them when issued. Finally, when certificates and expenses amounted to over $6,000 beyond income, at the end of only eight months' operation, the receiver and the Fords asked authority to sell the entire property of the plant for $6,500, just enough to pay the deficit; thus showing, if the receiver and the Fords are correct as to their estimate of the value, that the plant had entirely consumed itself in eight months' operation, and that not even secured creditors holding purchase-money liens on the plant and machinery would get a dollar on their indebtedness, if such expenses are to be first paid.

Under such facts we hold that the operation of the plant and issuance of certificates as prior liens to cover the costs was clearly improvidently issued and sold, and we sustain appellant's assignments attacking the legality thereof.

One of appellant's contentions in this connection was that inasmuch as the certificates could only be upheld, if at all, on the theory that, by reason of the light function of the plant, it constituted a public service corporation, the providence of the court's order should be tested on the basis of the operation of the light department alone, in which case, according to the court's fact findings, the improvidence becomes more glaring; but while recognizing force in this contention of appellant, inasmuch as we have sustained his other contention, that the op-

eration of the plant as a whole was unauthorized, we find it unnecessary to pass on this other contention of appellant.

The foregoing conclusion is decisive of the main and important issue involved; but, on account of the general importance of the questions involved in the case, we deem it proper to pass on other assignments of the appellant attacking the superiority of the certificates on other grounds.

Appellant's next contention, under his eighth, ninth, tenth, and eleventh assignments of error, is that the lower court erred in applying the law observed in the administration of receiverships of quasi public corporations instead of that regulating receiverships of private corporation, under the facts of this case.

[8] To pass on this contention a statement of the law on the subject, under the holdings of our Supreme Court, is essential. In the operation of a quasi public corporation the court may, in the exercise of a sound discretion, issue certificates for operating expenses, even to the displacement of prior mortgage liens. Ellis v. Water Co., 86 Tex. 109, 23 S. W. 858; Clint v. Houston Ice & Brewing Co., 106 Tex. 508, 169 S. W. 411. But this it cannot do if the corporation in receivership is a private-one, except under the doctrine of estoppel, which is not involved in this case. Craver v. Greer, 107 Tex. 356, 179 S. W. 862.

[9, 11] An ice company is a private corporation. Clint v. Houston Ice & Brewing Co., supra. It lacks the power of eminent domain and the public has no regulatory interest in the business.

With this statement of the law, we may proceed to appellant's contention, the gist of which is that since, under the facts above disclosed, the light department of the plant was so inconsequential, in that there were less than 58 subscribers to light in a town of 2,000 people, at the time of the issuance of the first certificates, as of which time the action of the court herein, in the first place, must be tested, where it is shown that the average monthly income for the eight-months operation from the light department was only $79.61, whereas the monthly average income from the ice department was $451.33, and where the receiver testified that the main business of the plant when operated by him was the ice business, and that as a business proposition it would have been out of the question to operate this plant as a light plant only, and where the receiver in making application for the issuance of additional certificates in April, 1916, predicated the same on the fact that he had secured "the re-icing contract with the American Brewing Association and Santa Fé Railway Company for re-icing the Santa Fé cars at Alvin," and in such application adds that he had gone through the summer season at a loss because

the business of the concern was "principally an ice business," that it thus appearing that the dominant function of the Mugler plant was a private pursuit, that the case is nearer to Craver v. Greer, supra, than Ellis v. Water Co., supra, and that the court should have adjudged the same accordingly. Appellant suggests that the trial court must have ruled the case on the scriptural doctrine that "a little leaven leaventh the whole lump."

[12, 13] There is force in appellant's position, and we are inclined to sustain it. The power to displace prior liens, and thus to impair the force of contracts, is such an extraordinary one (Craver v. Greer) that, in order to call into exertion such power, the facts justifying it should be clear and unequivocal. It would seem that a corporation, to be within the rule justifying the exercise of such an extraordinary power, should not only be potentially quasi public, but actually so, and to be the latter it should subserve some appreciable service to the public and to some reasonable extent meet a public demand and necessity. This it is apparent, under the facts, the Mugler Company did not do. It had only commenced business when it was put into receivership, and was not well into the experimental stage, and had not attained any status as an established plant at such time. For instance, the company had the charter power to manufacture and sell gas to the public, which the court found it never exercised. Gas companies, like light companies, have quasi public incidents. It would not be contended that this dormant, quasi public charter power, unexercised, would justify the application of the rule under consideration to receiver certificates issued to operate an ice business, authorized under the same charter. And the same result would follow if the gas function of the company was in operation, but had only two or three subscribers. If the premise assumed by us is sound, the principle follows that quasi public powers must find a correlative in appreciable quasi public duties and needs before the rule invoked by the lower court as authority for his action herein can be given application. In this connection it was expressly held, in the well-considered case of State of Washington ex rel. Tacoma Industrial Co. v. White River, 39 Wash. 648, 82 Pac. 150, 2 L. R. A. (N. S.) 842, 4 Ann. Cas. 987, that, before a light company would be entitled to the quasi public incident of eminent domain, it would have to come into existence as a result of a public demand and to meet a public necessity.

To emphasize that this conception is in line with judicial thought, it may be pointed out that in International Trust Co. v. United Coal Co., 27 Colo. 246, 60 Pac. 621, 83 Am. St. Rep. 59, the Colorado Supreme Court, in criticising the case of Ellis v. Water Co., by our Supreme Court, and in calling attention

to the fact that it was the only decision drawn to the attention of that court where the law applicable to railroad receiverships had been applied to an ordinary water company, sought to find justification for the decision in the consideration that "it might be that the court in its decision was influenced by the fact that the interests of the community, which derived its domestic water supply from the property, demanded a continuance of its operation by the receiver."

To a like effect the San Antonio Court of Civil Appeals in Brewing Co. v. Clint, 159 S. W. 409, in referring to the Ellis Case, assumed that doubtless the public had an interest in the waterworks system, and the chances were that there was only one water system in the community.

[14] In the case before us the defunct company was following both a private and a public pursuit. An entirely different rule of law applies on the question of priority under consideration to these different pursuits; both rules cannot be followed. Would it not be fairer and more just to all parties to apply that law which is applicable to the dominant pursuit of the company, and the pursuit on which was predicated the issuance of the certificates and the operation of the plant, than to apply the rule applicable to the other pursuit of furnishing light, where the facts show, as here, that the latter pursuit did not reach appreciable proportions, or to any reasonable extent subserve any substantial need in the life of the community? We think so.

We desire to add, without deciding, that there is a very grave question as to whether the Mugler Company was a quasi public corporation at all. It was organized under subdivision 72 of article 1121, Revised Statutes, passed in 1903, permitting the joinder of two or more purposes, including "the construction or purchase and maintenance of mills and gins; the manufacture and supply to the public, by any means, of ice, gas, light, heat, water and electric motor power, or either, * * * the harvesting of grain, or the harvesting and threshing of grain"; it being provided that such corporations shall not exceed a capital of $250,000. No power of eminent domain was given to a corporation thus organized for the two or more purposes just set out, nor was any regulatory power by the public given as to any such corporation organized under said subdivision.

It was not until 1911 that the power of eminent domain was given to light companies. Articles 1283a to 1283f, Vernon's Sayles' Ann. Civ. St. 1914. This power when given was only given to corporations organized "for the purpose of generating, manufacturing, transporting and selling gas, electric current and power." The Legislature must be held to have known that in 1903 it had permitted the joinder of different purposes under subdivision 72 of article 1121, but the power of eminent domain was not accorded to any corporation incorporated for more than one purpose, but simply to those dispensing gas and electric current and power.

In Bayou Cook Navigation & Fisheries Co., Limited, v. Doullut et al., 111 La. 517, 35 South. 729, it was held that corporations organized under different purpose clauses, one of which was of a private nature and the other quasi public, were illegal. The Louisiana Legislature, to cure the effect of such decision, passed a statute validating all of such corporations. In passing on this act the Supreme Court of Louisiana, in Louisiana Navigation & Fisheries Co., Limited, v. Doullut et al., 114 La. 906, 38 South. 613, held that such act of the Legislature had the effect to validate such corporations previously organized, but that it did not have the effect to extend the right of eminent domain to said corporations thus formed, and held that the joinder of a quasi public pursuit with a private one under the same charter deprived the corporation of the right of eminent domain, to which it would be entitled if the charter did not carry with it the right to engage in a private business. The court in that case, after referring to the fact that under the Louisiana statute a private individual was not given the right of eminent domain (which is likewise true in Texas), used this language:

"We do not think it would be a reasonable construction to hold that the same sovereign which has refused to accord to the natural person the use of the power of eminent domain has consented to accord it to an artificial person, qualified like the natural person to engage in business of a purely private character."

[15] A very strict construction is adopted where the question of the vesting of power of eminent domain is involved.

"So high a prerogative as that of divesting one's estate against his will should only be exercised where the plain letter of the law permits it." Cooley, Const. Lim. p. 651.

"The power of eminent domain being in derogation of the common right, acts conferring it are to be strictly construed, and are not to be extended beyond their plain provisions." 15 Cyc. 557.

[16] From the foregoing considerations it is a matter of grave doubt whether the Mugler Manufacturing Company may be considered a quasi public service corporation as a matter of law, under a proper conception of our statutes. That it is ordinarily essential to such corporations that they have the power of eminent domain, and the public should have a regulatory interest therein, cannot be doubted. Borden v. Rice Irrigation Co., 98 Tex. 494, 86 S. W. 11, 107 Am. St. Rep. 640; Queen Insurance Co. v. State, 86 Tex. 250, 24 S. W. 397, 22 L. R. A. 483; Attorney Gen-

eral v. Haverhill Gas & Light Co., 215 Mass. 394, 101 N. E. 1061, Ann. Cas. 1914C, 1266; Logan v. North Carolina Railroad Co., 116 N. C. 940, 21 S. E. 959.

Appellant's next contention is that there are differences in a vendor's lien and an ordinary mortgage, and that the former is superior to operating expenses of a quasi public corporation, even though the latter may not be.

We are inclined to hold that appellant's contention should be sustained, and if it were not for the holding of the San Antonio court in the case of Gulf Pipe Line Co. v. Lasater, 193 S. W. 773, to the contrary, we would be disposed to unequivocally sustain appellant's contention. But in view of the holding of that court in the case cited, which is in conflict with the views entertained by us, and in view of the fact that we have and shall dispose of the main issues presented in the present case upon other grounds, we refrain from expressing a definite holding on the point raised by the assignment. The writer, however, does not agree with the holding in the Gulf Pipe Line Case upon the point under discussion, but, to the contrary, entertains a radically different view, and will take this opportunity to state briefly his views:

A deed to land in Texas, retaining a vendor's lien to secure purchase money, is an executory contract, and, in case of default by the vendee, the vendor may rescind and recover the land, or else sue for the purchase money, in which latter event "the result is generally considered tantamount to a suit for specific performance." The vendor tenders the title, and the vendee must meet the tender with the purchase money to hold the land. The covenants to convey the title and pay the purchase price are concurrent and dependent. Heirs of Roberts' Heirs v. Lovejoy, 60 Tex. 255; Von Roeder v. Robson, 20 Tex. 765; Hamblen v. Foltz et al., 70 Tex. 136, 7 S. W. 834; Summerhill v. Hanner, 72 Tex. 227, 9 S. W. 881. A receiver has no greater right than the vendee in whose shoes he stands, and must tender the purchase money to acquire the title. Continental Trust Co. v. Brown, 179 S. W. 940. "The vendor does not part with the title until he receives the purchase money." Corbus v. Teed, 69 Ill. 205; Clark v. Hall, 7 Paige (N. Y.) 385. Under these holdings the writer fails to see the logic of permitting a divestiture of the vendor's title by a receiver, under the guise of operating expenses of a public corporation, without tendering the purchase money.

Another vital distinction between an ordinary mortgage and a vendor's lien in this state may be seen in the construction placed by our courts on article 3458, Rev. St., which gives priority to funeral expenses, expenses of last sickness, and of administration over "claims secured by mortgage or *other liens*" (italics ours), and as to which it has been repeatedly held that a vendor's lien, when connected with a superior title, does not come within the subordinating purview of the words "or other liens," but, in the hands of an assignee who has not taken a transfer of the superior title, it does come within such class of liens. Toullerton v. Manchke, 11 Tex. Civ. App. 148, 32 S. W. 238; Robertson's Adm'x v. Paul, 16 Tex. 472. If the courts refuse to class vendor lien notes with "other liens" under the mandate of a plain statute, they cannot consistently do it, in the opinion of the writer, on the ground that the public interest is involved.

Another radical distinction to be noted is the difference which follows a suit to foreclose a mortgage on failing to make the mortgagor's vendee a party and a like failure to make the vendor's subvendee a party. In the former case the rights of the purchaser from the mortgagor are not affected, whereas in the latter case the vendor forecloses on his own superior title, and, if he buys in the land, he can bring trespass to try title suit against the purchaser from his vendee. Ufford v. Wells, 52 Tex. 612; Cattle Co. v. Boon, 73 Tex. 548.[1] Where the mortgagee forecloses, he does so on the title of the mortgagor, and, if this title was conveyed by the mortgagor prior to foreclosure, such purchaser is not affected. The vendor, however, forecloses on his own superior title in order to compel specific performance.

It is clear to the writer that Gulf Pipe Line Co. v. Lasater, supra, is wrongly ruled. The decisions cited to support the holding are easily distinguishable, but space forbids further comment in this connection. The remarks already made are actuated with the hope that they might bear fruit, or at least be helpful, if the question comes directly before the Supreme Court and is re-examined. It may merely be added that it seems peculiar that the vendor cannot say to his purchaser in default, who may happen to be thereafter placed in receivership, "I tender you the title and demand compliance with your contract," without thereby divesting himself of the title and having it vested in the receiver, and in addition be relegated to the attitude of a mere mortgage lienholder seeking a foreclosure against one who has the fee-simple title. If this does not run counter to the constitutional inhibition against taking private property without due process of law, and for public purposes without just compensation, it would be difficult to conceive an infraction of these salutary bulwarks. No matter how exigent the need of a municipality for a light utility, not a foot of dirt could be taken for that purpose without payment of just compensation to the

[1] 11 S. W. 544.

owner, either by conventional agreement, or invoking the power of eminent domain. Can these constitutional provisions be circumvented by buying land on a credit, locating an electric light plant, starting operations, going into receivership, and taking the property from the vendor to cover the costs thereof? Would not this process be clearly as much taking private property for public purposes without just compensation as it would have been to have done so in the beginning? In either event, is not the land taken without compensation? If the public has no right, under the Constitution, to demand such dedication to public uses in the first instance, by what judicial legerdemain does the public acquire this right in the latter? Is it good law, or sound and honest public policy, to adopt such rule? Will it not retard the public welfare, which, let us hope, it is designed to promote, by causing landowners to refuse to sell needed locations to public utilities, except for cash? These are questions which press for proper solution, and should be pondered well before the adoption of the Lasater Case is given established adherence.

[17-20] This court does, however, unequivocally hold that the vendor's lien of Van Valkenburgh upon the property sold by him to Charles G. Mugler is a superior lien to the costs incurred in the receivership and the receiver's certificates issued by authority of the trial court in said receivership. Van Valkenburgh sold the property to Charles G. Mugler, a private person, retaining in himself the superior title thereto until the purchase money should be paid, and, so far as the record shows, he had no knowledge at the time that Mugler contemplated organizing a quasi public corporation and conveying said property to it. The debt for which Van Valkenburgh sued Mugler in his separate suit was a debt against Mugler, his vendee, for a part of the purchase money for the property. It was not a debt of the corporation, either originally or by assumption, but was a debt of Charles G. Mugler alone. We have been cited to no case in which it is held that, in such case as the one under consideration, the vendor's lien was held to be inferior and subordinate to either the costs of receivership or to certificates issued by the receiver. Nor do we know of any such case. The superior title to the property never passed from Van Valkenburgh to Mugler, but was specially retained in the deed of conveyance by Van Valkenburgh. Therefore the Mugler corporation has never had title to said property. All the right the corporation, or the receiver of its property, who stands in its shoes, has in the property, is the equitable right to hold it by paying the unpaid purchase money. It seems that Van Valkenburgh secured

this property originally through a sheriff's sale of the old Alvin Water, Light & Ice Company. It does not appear from the record whether such concern was a corporation or a partnership. When appellant held it, he owned it as an individual. He likewise sold it to an individual. Individuals in Texas have no right of eminent domain, and have not been endowed with the incidents of belonging to quasi public utility corporations. The state has a right to part with its sovereign power to such agencies as it deems proper, but in Texas it has not seen proper to bestow this right, in the case of operating light companies, to individuals. Article 1283d, Vernon's Sayles' Ann. Civ. St. 1914; People v. Erie Railroad, 198 N. Y. 369, 91 N. E. 849, 29 L. R. A. (N. S.) 240, 139 Am. St. Rep. 828, 19 Ann. Cas. 811; Hammond Packing Co. v. Arkansas, 212 U. S. 322, 29 Sup. Ct. 370, 53 L. Ed. 530, 15 Ann. Cas. 645; Louisiana Navigation & Fisheries Co. v. Doullut et al., 114 La. 906, 38 South. 613.

In the case of Lehman v. Trust Co. of America, 57 Fla. 473, 49 South. 502, it was held that where a judgment lien creditor's rights were fixed against property belonging to the president of a light and power corporation, before he conveyed it to such corporation, such rights of the judgment creditor could not be subordinated to receiver certificates "issued for money to be borrowed by the receiver" as "a first or prior lien upon all of the mortgaged properties."

[21] It seems to us, and we so hold, that where the plant was idle and stagnant at the time of its sale by appellant, who had no power of eminent domain, and where appellant sold to a private individual, his rights became fixed at that time, and that the subsequent incorporation of a company which has quasi public incidents, and it becoming involved in receivership, could not have the effect to destroy the prior fixed and vested rights of appellant.

Appellant next directly assails the doctrine extending the rule observed in railroad receiverships to other ordinary corporations with quasi public incidents, and asserts that it is not so firmly established in Texas as to preclude its reconsideration. We must rule the point against appellant. Ellis v. Water Co., Brewing Co. v. Clint, Craver v. Greer, and Gulf Pipe Line Co. v. Lasater, all cited supra.

By appellant's thirteenth assignment of error it is contended that the Ford interveners, having adopted the proceedings shortly after Mugler brought the suit, and having used the proceedings as a machinery to collect some $6,000 of personal debts against the company, and as promotive of their interest as holding half of the capital stock in the corporation, and by virtue of their having made a private agreement with the receiver whereby they agreed to take all pre-

ferred receiver certificates which the receiver might succeed in having issued, that the business was in effect being run under the guise of a receivership by the Ford interveners, without regard to the interests of creditors, and that the Fords should be held to be estopped to assert the certificates against the prior vendor lien owned by appellant.

Appellant asserts an analogy between the position of Mrs. Ford as an unsecured creditor, adopting the proceedings for the collection of her debt and securing the issuance of the certificates, to that of a mortgagee who secures a receivership to collect his mortgage, and by estoppel is held to have subordinated his mortgage rights to the expenses of a receivership thus procured by him, claiming that where these expenses in the instant case were incurred by an interested creditor like Mrs. Ford, to further her own private ends, that she should be estopped to assert any superior rights under certificates thus issued to meet such expenses.

It was said by this court, speaking through Justice Graves, in Farthing Lumber Co. v. Greenwood et al., 197 S. W. 313, where the question of allowance of attorney's fees was involved in a receivership proceeding, after referring to a contract between two of the leading stockholders of the corporation, Greenwood and Farthing, that—

"While we deem it unnecessary to recite the full provisions of this contract, the very preamble of it shows, although the two corporations were nominally parties, that appellee Greenwood and J. B. Farthing were the only real parties at interest in the entire receivership litigation, notwithstanding its necessary prosecution through the forms and procedure appertaining to corporations, the machinery by and through which their property and interests were held and operated."

We think the same is true of the instant case, and that it is clear that Mrs. Ford was carrying on the business of the Mugler Manufacturing Company under the guise of the receivership, and that she was the real party at interest. We think the following from the case of Hanna v. Trust Co., 70 Fed. 2, 16 C. C. A. 586, 30 L. R. A. 201, is strikingly in point in the present case, simply substituting in that opinion for the "junior mortgagee" the appellee in the instant case:

"In this case, the company being insolvent, and its property mortgaged for more than it was worth, there was no way of raising money to set the receiver up in business, except by the court giving its obligations, in the form of receiver's certificates, and making them a paramount lien on all the property of the corporation, by displacing the appellant's prior liens thereon. As commonly happens in cases of this character, the receiver, the insolvent corporation, and the junior mortgagee united in urging the court to arm its receiver with the desired powers. They ran no risk in so doing. The corporation was insolvent, and a foreclosure of the prior mortgage would leave the junior mortgagee without any security; so that it had nothing to lose, and everything to gain, in experiments to enhance the value of the mortgaged property, so long as the cost of those experiments was made a prior lien thereon. The effect of the proceeding was to burden the prior mortgagee with the whole cost of the expenditures and experiments made for the betterment of the property on the petition, and for the benefit of the insolvent corporation and the junior mortgagee. The representation is always made, in such cases, that the receiver can carry on the business much more successfully than was done by the insolvent corporation. This commonly proves to be an error."

Further in the opinion the court said:

"And if the complainant desired that money be spent, beyond the income of the property, in carrying on the business of the corporation or improving the mortgaged property, it was at liberty to furnish the means for that purpose; but it had no equity to ask that the expense and the hazards of doing so should be saddled on the first mortgagee, and the court had no jurisdiction or power to place it there."

[22] We do not mean to hold that the mere fact that a stockholder and unsecured creditor of a corporation purchases receiver certificates issued for operating expenses of a quasi public corporation, where such certificates are properly and providently issued, as determined on a prior and full hearing in the cause, would be precluded from asserting such certificates against prior mortgage lienholders; but we do hold that where the undisputed facts show that such stockholder adopted the proceedings, and became the chief mover, and where she makes a private agreement with the receiver, who should stand as an impartial representative of all the creditors, whereby the receiver, acting, in affect, as her agent, secures the issuance of certificates with an understanding that such stockholder will purchase the same, and where no notice of such application for certificates was given to any creditors, and where such certificates were not applied for by any creditors of the corporation, and no application to continue the operation of the plant was made by any creditor or by any of the public, and where the undisputed facts show that the operation of the plant was secured by the co-operation of such stockholder and unsecured creditor in the hope of sustaining a hopelessly financially involved corporation, that such certificates, under such circumstances, cannot be upheld as against a prior lienholders, who was not a party to the proceeding and was given no notice.

We think what the Supreme Court held in the case of First National Bank of Houston v. Campbell, 104 Tex. 457, 140 S. W. 430, has application here, wherein, in construing article 1490, Revised Statutes 1895, providing that claims existing against a corporation at the time of the appointment of a receiver shall be paid out of the earnings of such cor-

poration while in his hands, to the exclusion of the mortgage action, and in holding that this had reference to a mortgagee who invited the proceedings, used this language:

"It could, we think, have no application to a case where a receiver was appointed, not at the instance of the mortgage holder, and not as a result of a mortgage action, but without the concurrence, co-operation, or consent of the mortgage holder. If it should be held that this statute applied, and would defeat the participation by the mortgage holder in the earnings of the property during receivership, where such receivership had been brought about by the action of the unsecured creditor, this would constitute an invitation, if not an encouragement, to receiverships of corporations by unsecured creditors, who in this way could impound the property of such companies, secure their operation by a receiver, and, to the exclusion of the mortgage holder, apply the earnings of such properties to the payment of their debts."

We think it can be equally said that to hold in this case that the principal stockholder of the corporation, and the largest individual creditor of the corporation, could carry the same on, under the cover of a receivership, at the expense of the prior lienholder, would be an invitation to the stockholders of every private corporation, as well as the unsecured creditors, when such corporation happened to be affected with the slightest public interest, to place it in the hands of a receiver, and, through the order of the court, carry on, at the prior lienholder's expense, a speculative venture, which would otherwise fall on such stockholder and creditor as the sole person who would be responsible for such continuance in business in the absence of the court's assistance.

In this connection we add that it is significant of the close relations existing between the Ford interveners and the receiver throughout this litigation that they joined in making all applications to the court for any specific relief in the case, jointly urged motions requiring the appellant to consolidate, and appear in this court in a joint brief to uphold their joint contentions in this case. This is all indicative of practically an agency relation on the part of the receiver to the Fords, and of the fact that the certificates were issued, and operations conducted, with the view, it is clear, of throwing the result of such speculation on all prior realty and machinery lienholders, and under these special facts we think appellant's contention in this regard should be sustained.

Appellant, by his twentieth, twenty-first, twenty-second, and twenty-third assignments of error and propositions thereunder, complains of the action of the trial court in adjudging the fees of the receiver, his attorney, and master in chancery, respectively, as superior to his vendor's lien.

[23] We think these assignments should be sustained for the reason given for sustaining the assignments complaining of the prior-

ity given the certificates, which renders it unnecessary to enter into a discussion of these assignments. It is quite generally held that a person who is in no wise responsible for receivership proceedings, and who does not voluntarily intervene in the proceedings, and voluntarily use them for the collection of his debt, and where such proceeding are improvident, and shown to have not resulted in any good to creditors, that such person, who is no wise responsible therefor, cannot be held liable for the costs thereof. This proposition holds good to quasi public and private corporations alike. Such costs do not, constitute operating expenses within the purview of the doctrine applied to receiverships of quasi public corporations. It appears that all of these fees were incurred before appellant was made a party to the suit, as on the same date that the receiver and the Fords filed a motion to force appellant to consolidate they joined in a recommendation that all of the above fees in the above amounts should be paid. Gulf Pipe Line v. Lasater, 193 S. W. 773; Brewing Co. v. Clint, 159 S. W. 409; Bank v. Railway, 36 S. W. 136; Brewing Co. v. Fuller, 26 Tex. Civ. App. 239, 63 S. W. 1048; High on Receivers, § 796; Frick v. Fritz, 124 Iowa, 529, 100 N. W. 513; McAnrow v. Martin, 183 Ill. 467, 56 N. E. 168; First National Bank v. Cook, 12 Wyo. 492, 75 Pac. 674, 78 Pac. 1083, 2 L. R. A. (N. S.) 1012; Lane v. Washington Hotel Co., 190 Pa. 230, 42 Atl. 697.

[24] We, therefore, sustain appellant's assignments attacking such priorities, it appearing that appellant was involuntarily forced to appear in the proceedings; but we overrule similar assignments on the part of the machinery interveners in so far as their interest under their chattel mortgages thereon may be held to exist, it appearing that said interveners voluntarily appeared in the proceedings and used them voluntarily for the collection of their debts.

It now becomes necessary to consider the contest between Van Valkenburgh's vendor's lien and the chattel mortgagee claims of said machinery interveners:

For a statement of the facts showing the inception of Van Valkenburgh's vendor lien rights on the Mugler property, we refer to the general statement at the inception of this opinion on the other branch of the case.

We will first consider the case arising between Van Valkenburgh and the Muncie Oil Engine Company.

Subsequent to the sale of the property by Van Valkenburgh to Mugler the Muncie Oil Engine Company sold to the Mugler Company two Muncie oil engines, one a 75 horse power and the other a 40 horse power, partly for cash and partly on credit, retaining purchase-money notes for the deferred payments secured by a chattel mortgage.

The lower court sustained the position of

the Muncie Oil Engine Company, and held that its chattel mortgage lien was superior to the vendor lien rights of Van Valkenburgh.

By appropriate assignments appellant challenges the action of the trial court in allowing priority to the Muncie Oil Engine Company under its chattel mortgage, contending that said engines constituted fixtures and a part of the realty, and became subject to appellant's vendor lien for principally four reasons: (1) Because of the method of the fixation of such engines to the realty; (2) because it was shown that the removal thereof would cause injury to the realty; (3) because the same constituted motive power in a manufacturing enterprise; and (4) because said Muncie engines took the place of other engines in the plant at the time Van Valkenburgh sold to Mugler, and this appellant's security had been depreciated by the removal of the other engines.

We will consider these positions in the order stated:

(1) As to the method of fixation: The court found that the 75 horse power Muncie engine was attached to the realty in the following manner:

"The 75 horse power engine weighs 30,000 pounds. It was fixed or fastened in place in the following manner: It set upon a concrete bed mixed with scrap iron. This concrete bed was 6 feet deep, and was 13 feet in length, by 9 feet in width at its base, and was 11 feet long by 9 feet wide on the surface of the ground. The concrete protruded a short distance above the ground, so as to be shaped up to the engine, in order to raise the engine above the ground, so the flywheel will have a clearance. The engine is attached to this concrete by iron bolts 4 feet long, which were laid with a bend in them, and the concrete poured on top of that. The bolts were one and one-half inches in diameter, and came up above the surface, and were run through a hole in the bed of the engine, and then the bolts are fastened by the screwing of a nut on the end of them. By unscrewing the nut you can lift the engine off. This bolt protrudes about three inches above the concrete, just enough to bolt the engine down. The other 4 feet of these bolts are in the concrete. In addition to the 9 by 11 feet surface for said concrete foundation for the 75 horse power engine there is an extension of said concrete foundation known as the outboard bearing, which is 4 feet below the ground, and which is also 4 feet square at its base, and slopes up to 3 feet at the surface of the ground. This is known as the cut-board foundation that supports the outer shaft pillar. It extends out from the 9 by 11 concrete foundation at the surface, and comes above the ground 54 inches."

The court further found that this foundation was first constructed for a Bessemer engine, which was not delivered, and that the foundation was then shaped up to meet the requirements of the Muncie engine, which was the first and only engine which had ever set on the foundation. He further found that the appellee Muncie Oil Engine Company, or its agents, knew the character of said foundation, and the method in which said engine would be attached thereto.

The 40 horse power engine, weighing 15,000 pounds, the court found to be attached in the same manner as the 75 horse power engine, and, further, that the foundation for the 40 horse power engine was constructed especially for said engine according to plans furnished by the Muncie Oil Engine Company.

[25] Appellant contends that by reason of the foregoing facts, showing the method of the attachment of such engine to the realty, upon their becoming installed they became, as a matter of law, part of the realty, and passed under the lien of appellant's purchase-money notes against the property, and we sustain appellant's contention upon the following authorities: Menger v. Ward, 28 S. W. 824; Jones v. Bull, 85 Tex. 139, 19 S. W. 1031; Brown v. Roland, 92 Tex. 54, 45 S. W. 795; Clary v. Owen, 15 Gray (Mass.) 522; Bass Foundry v. Gallentine, 99 Ind. 525; Larue v. American Diesel Engine Co., 176 Ind. 609, 96 N. E. 772; Frankland v. Moulton, 5 Wis. 1; Ottumwa Woolen Mills Co. v. Hawley, 44 Iowa, 57, 24 Am. Rep. 719; Wood v. Whelan, 93 Ill. 153; Southbridge Savings Bank v. Stevens Tool Co., 130 Mass. 547; Phœnix Iron Works v. New York Security & Trust Co., 83 Fed. 757, 28 C. C. A. 76; Reynolds v. Ashby & Son, 73 L. J. K. B. (N. S.) 946, 20 Times L. R. 766, 53 Week. Rep. 129.

The case by the English House of Lords of Reynolds v. Ashby & Son, last cited, is so strikingly in point, and is decided by a court held in such high regard, that we shall take the liberty of quoting from the case somewhat liberally, as fully expressive of our views in this case.

The syllabus in that case is as follows:

"Machines were supplied by the owner of them to the lessee of a factory upon the hire-purchase system, the machines to remain the property of the owner until they had been wholly paid for; upon default in payment the owner to have power to determine the hiring and remove the machines. They were affixed, as the owner knew, to concrete beds in the floor of the factory by bolts and nuts, and could have been removed without injury to the building or the beds. The lessee made default in payment, and the owner brought an action to recover the machines or their value from a mortgagee of the premises, who had taken possession. Held, that the machines had been so affixed as to pass by the mortgage to the mortgagee."

In disposing of the case Lord James used this language:

"My lords, it must be taken that the appellant was aware that the machines would be used in a factory and would be affixed in the usual manner to the building. * * * The manner in which the machines were affixed to the buildings has been clearly brought to the notice of your lord-

ships, and is shown by some sketches set out in the case. This affixing of the machines is to obtain steadiness, and effects the sole condition under which such machines are used.

"My lords, the authorities controlling the questions respecting the difference between fixtures and chattels are very numerous, and have arisen between different parties. * * * I do not propose to review these authorities in detail, but, having consulted and considered them, I have come to the conclusion that the weight of authority is in favor of the view that these machines must be held to be affixed to the building so as to pass under the 'mortgage as being a portion of the factory [citing numerous authorities].

"My lords, it was argued at the bar that, as Holdway had not paid for the machines, they remained the property of the appellant, and could not, by any act of Holdway, be dealt with as fixtures; but the argument cannot, I think, prevail. The machines were sold by the appellant for the purpose of being used in the manner in which they were used. In order to use them it was necessary that they should be fixed and so become part of the building. For these reasons I feel that, following a great preponderance of authority, your lordships' judgment should be in favor of the respondents."

Lord Lindley made the following observation:

"My lords, Holdway did not pay the installments of his purchase money as they became due, and the machines, therefore, never became his property. The appellant knew that the machines were wanted in order to fit up a factory which Holdway was building. The purpose for which the machines were obtained and fixed seems to me unmistakable; it was to complete and use the buildings as a factory. It is true that the machines could be removed if necessary, but the concrete beds and bolts prepared for them negative any idea of treating the machines when fixed as movable chattels."

Lord Lindley concluded by holding that in his opinion it was "impossible to hold that the machines did not pass with the mortgage."

The above position is amply sustained by decisions from our Texas courts, cited supra.

(2) As to injury to the realty in the present case, the court found on this phase of the matter as follows:

"The court finds that said engine could be removed without doing any injury to the building, or to said concrete bed. The concrete bed itself does an injury to the real estate proper, to the extent of the space in said real estate and the surface of said real estate that it takes up, and would destroy that portion of the land which it covers for any horticultural, farming, or gardening purposes. The lots on which it is located are 50 feet wide, and not over 150 feet deep. Should the ground be devoted to other purposes, it would be necessary to remove the protruding portion of said concrete bed, the main foundation of which extended above the surface some 33 inches, and the foundation for the out-board bearing some 54 inches."

He found the same also as to the 40 horse power engine, the only difference being less actual floor space.

He found that both concrete foundations could "probably be blasted out in time, but it would take a long while to do so."

Appellant contends that, according to the foregoing undisputed facts as found by the trial court, that the concrete beds. must be considered a part of the machinery, and that such beds constituted an injury to the realty, and, this being so, that the engines became a fixture. We think this contention is correct, and in addition to the foregoing authorities are the following: Meyer v. Orynski, 25 S. W. 655; Larue v. American Diesel Engine Co., 176 Ind. 609, 96 N. E. 772; Campbell v. Roddy, 44 N. J. Eq. 244, 4 Atl. 279, 6 Am. St. Rep. 889; Swift v. Thompson, 9 Conn. 63, 21 Am. Dec. 718; Jones on Mortgages (7th Ed.) § 436b.

(3) As to engines constituting motive power in manufacturing enterprises, appellant cites many well-reasoned cases in support of the proposition that, where machinery constitutes the motive power of a plant in which is located machinery used for manufacturing or other industrial purposes, such machinery constitutes fixtures. Phœnix Iron Works v. New York Security & Trust Co., 83 Fed. 757, 28 C. C. A. 76; Keeler v. Keeler, 31 N. J. Eq. 181; Hill v. Wentworth, 28 Vt. 428; Powell v. Munson Mfg. Co., 3 Mason, 459, Fed. Cas. No. 11,357; Ottumwa Woolen Mills Co. v. Hawley, 44 Iowa, 57, 24 Am. Rep. 719; McConnell v. Blood, 123 Mass. 47, 25 Am. Rep. 12; Voorhees v. McGinnis, 48 N. Y. 278; Frankland v. Moulton, 5 Wis. 1; Jones on Mortgages, vol. 1 (7th Ed.) § 446.

While the foregoing authorities appear to sustain appellant's contention as to the law in other states, the question does not seem to have ever been passed on by the courts in this state, and, inasmuch as we hold that the engines became fixtures on other grounds well settled in this state, we find it unnecessary to pass upon this contention of appellant, and do not do so.

(4) As to the Muncie engines taking the place of old machinery: At the time Van Valkenburgh sold the real estate and plant to Mugler, according to the finding of the court,

"there were other engines located therein which performed the same functions as the above two engines, more or less efficiently, which machinery, on which the said Van Valkenburgh retained a vendor's lien, was taken out of the building and was substituted by the machinery sold by the Mugler Oil Engine Company; that the Mugler Oil Engine Company knew that the old machinery had been taken out of the building and that their machinery was taking the place of this old machinery."

The court further found that the deed from Van Valkenburgh to Mugler, retaining a vendor's lien, was promptly recorded in the proper records in Brazoria county, Tex.

[26] Appellant contends that in addition to the reasons already urged, to the effect that said engines became fixtures, that it is also established that where a vendor sells a plant with machinery located therein, subject to a vendor's lien on same, which machinery is subsequently removed, and new machinery installed, the new machinery takes the place of the old machinery, and becomes subject to the lien, on the ground that the vendor's security will not thus be permitted to be depreciated.

In a very recent Texas case (Murray Co. v. Jacksboro Oil & Milling Co. et al., 205 S. W. 517) this question was decided in appellant's favor. In that case the Murray Company sold machinery to Simmons Bros. to take the place of old machinery, and retained a chattel mortgage on the new machinery sold, and it was held that the chattel mortgage of the Murray Company was inferior to the prior deed of trust of the Jacksboro Oil & Milling Company, on the ground that that company—

"was entitled to the full protection of its security under the deed of trust, unimpaired by the changes made in the machinery in the gin, the essential character of which change was known to appellant prior to and at the time it took its chattel mortgages."

It may be further noted that in that case there was an express stipulation in the chattel mortgage that the machinery should not be considered as personal property, wherever the same was located, until fully paid for according to the terms of the chattel mortgage.

We refer to that case and the many authorities therein cited and discussed. This proposition is also sustained by authorities in other states. Bass Foundry v. Gallentine, 99 Ind. 525; Binkley v. Forkner, 117 Ind. 176, 19 N. E. 753, 3 L. R. A. 33; Campbell v. Roddy, 44 N. J. Eq. 244, 14 Atl. 279, 6 Am. St. Rep. 889; Phœnix Iron Works v. New York Security & Trust Co., 83 Fed. 757, 28 C. C. A. 76; Sturgis National Bank v. Levanselar, 115 Mich. 372, 73 N. W. 399; Ottumwa Woolen Mills Co. v. Hawley, 44 Iowa, 57, 24 Am. Rep. 719.

In Bass Foundry Co. v. Gallentine, supra, the Supreme Court of Indiana, in holding that the lien of the prior mortgage attached to new machinery installed to take the place of old machinery, used this language:

"The old machinery was subject to the mortgage; the mortgagor could not substitute new for old, and compel the mortgagee purchasing at the foreclosure sale to take the mill in a dismantled condition, because of a contract made by the mortgagor with some third person, to which the mortgagee was not a party, to which he never consented, and of which he had not notice. * * *

"No agreement made by the mortgagor could bind the mortgagee; it would be inequitable to compel the mortgagee to take the mill in a dismantled condition; personal property, thus voluntarily affixed to mortgaged real estate necessarily becomes subject to the mortgage; there is no semblance of equity against the mortgagee in favor of the party who thus permits his personalty to become real estate, having notice of the mortgage by record. * * *

"Upon the foreclosure of such a mortgage, and the purchase by the mortgagee at the foreclosure sale, he buys the property as it stands, and not a dismantled mill, with its machinery and furniture gone."

[27] It follows from what has been said that the action of the lower court in allowing priority to the chattel mortgage of Muncie Oil Engine Company on the engines is reversed and rendered in favor of appellant.

With regard to the similar contest between appellant and the Mercantile Trust Company of Illinois, the machinery in question consisted of one Larsen standard eighteen-ton ammonia compressor, on which the Larsen Ice Machinery Company retained a chattel mortgage to secure part of the purchase money.

The facts regarding the installation of this machinery are substantially the same as the facts found by the court in connection with the installation of the Muncie engines; the method of fixation was on concrete beds, similar to those on which rested the Muncie engines; the same fact findings were made with regard to the injury to the realty and with regard to the Larsen ice machine taking the place of another ice machine on the premises at the time Van Valkenburgh sold to Mugler, to the knowledge of the Larsen Ice Machine Company.

The facts being practically the same, it becomes unnecessary to discuss the matter further than to adopt the same rulings hereinabove set out with regard to the Muncie oil engines, which is accordingly done, and the action of the lower court in allowing priority to said Mercantile Trust Company of Illinois, the owner at the time of the trial of the notes and chattel mortgage executed by the Mugler Company to the Larsen Ice Machine Company, is reversed and rendered in favor of appellant.

[28] We find the facts different as to the contest between Van Valkenburgh and the Southwest General Electric Company. The facts indicate that the exciter sold by that company to the Mugler Company was not a very large piece of machinery, and not attached to the realty in such manner as to constitute it a fixture, nor does it appear from the record that it took the place of another similar piece of machinery, nor does it appear that removal thereof will work an in-

jury to the realty; and, because of the difference in facts, the rules of law applicable to the other contests do not apply to this one, and we hold that this electric exciter remained personal property, and became subject to the chattel mortgage executed to secure the same, which we hold to be superior to the appellant's vendor's lien, and the action of the trial court in regard to this contest is affirmed.

We are greatly indebted to counsel who prepared the very able briefs for appellants Van Valkenburgh and the machinery interveners, as we have in this opinion copied much matter therefrom and adopted the same as our own.

From what has been said, we reach the conclusion that so much of the judgment of the court below as fixes and establishes priorities described therein, and so much thereof as establishes and directs the order in which the proceeds of the sale of said properties shall be paid upon the judgments awarded the several parties be, and the same should be, and the same is hereby, set aside and vacated. And that the vendor's lien held and asserted by R. W. Van Valkenburgh upon lots 2 and 3, in block 2, in the A. C. Wade addition to the town of Alvin, in Brazoria county, Tex., together with all buildings, fixtures, and machinery, etc., and all poles, wires, and fixtures upon and along the streets of Alvin belonging to said Mugler Manufacturing Company, except the generator and switch boards and equipment described in the decree of the trial court as that on which the Southwest General Electric Company holds and asserts a mortgage lien, should be, and the same is hereby, foreclosed as against all the other parties to this consolidated cause. And we further conclude that the proceeds of the sale of said properties, as ordered by the trial court, should be applied in payment of the items and judgments decreed to the several parties in the following order:

(1) All taxes due on said property.

(2) The judgment for $4,517 in favor of R. W. Van Valkenburgh, and interest thereon, excluding, however, so much of said proceeds as arise from the sale of said generator and switch boards and equipments upon which the Southwest General Electric Company held its lien.

(3) The judgments for $800, $500, and $300, in proportion to their several amounts adjudged to A. T. Page, receiver, as salary, J. C. Jessup, attorney, and W. S. Sproles, master in chancery, if there be any balance after the payment of the foregoing judgments and tax items.

(4) The judgments in favor of the Muncie Oil Engine Company and the Mercantile Trust Company of Illinois, same to be paid only out of any balance remaining of the proceeds of the sale of property, respectively, on which they held liens after the foregoing items are paid in full.

(5) The judgments in favor of A. T. Page for the sum of $410, and in favor of Mrs. Gay Ford for $3,806, recovered by her upon receiver's certificates held and owned by her at the time of the trial of said cause, in proportion to the two judgments.

(6) We further conclude and adjudge that the mortgage lien held and asserted by the Southwest General Electric Company upon said generator and switch board equipment hereinbefore described should be, and the same is hereby, foreclosed as against all other parties to this cause; and that the proceeds arising from the sale of said property, except its proportionate part of the taxes due on the whole of the properties, and its proportionate part of items mentioned in section 3 hereof, be applied to the payment of the judgment in favor of the Southwest General Electric Company.

We further conclude that so much of the costs as were incurred in the trial court by reason of the separate suit of R. W. Van Valkenburgh against Charles G. Mugler should be, and the same is, adjudged against Charles G. Mugler, and that the remaining costs incurred in the trial court be, and the same are, adjudged against Charles G. Mugler, Mrs. Gay Ford, and Harry Ford, jointly and severally.

It is further ordered and adjudged that in all other respects the judgment of the court below be, and the same is hereby, in all things affirmed.

Reversed and rendered in part and affirmed in part.

GRAVES, J. I concur in the general conclusion that Van Valkenburgh's vendor's lien is superior to both the claims growing out of the receivership and those of the chattel mortgage holders, and consequently in the disposition made of the case; but am not prepared to acquiesce in all the reasoning of the court, nor in all the expressions of individual views contained in the opinion.

It may be that upon rehearing I shall feel called upon to go further into the matter, but for the present, the record being already quite long, I shall refrain from extending it.

On Motion for Rehearing.

LANE, J. In our original opinion we stated with reference to the receiver's certificates issued that—

"Certificate No. 1 was issued on October 26, 1915, for the sum of $500. Certificates Nos. 2 and 3, for the sum of $500 each, were issued in favor of Harry Ford on the 25th day of November, 1915. Certificates Nos. 4 and 5, for the sum of $500 each, were issued on the 25th day of November, 1915, in favor of Mrs. Gay Ford. * * *"

Again we said:

"The appointment of the receiver and the issuance of and sale of the receiver's certificates before mentioned was upon ex parte application of Charles G. Mugler and A. T. Page, receiver, without notice to any of the interveners or other creditors, and without their consent."

Neither of the foregoing statements are literally correct.

Appellant Van Valkenburgh has filed his motion for rehearing, and therein says that the findings quoted are not literally correct, and has asked that the errors pointed out be corrected. In reviewing the facts we find that appellant's complaints are justified; we, therefore, in lieu of the first error pointed out, now find as follows:

The issuance of certificate No. 1, for the sum of $500, was authorized by the court on the 28th day of October, 1915, and was issued shortly thereafter to one E. E. Ritter, who thereafter sold the same to Mrs. Gay Ford. The issuance of certificates Nos. 2 to 5, inclusive, were authorized on the 25th of November, 1915, and were issued by the receiver to the parties and on the dates as follows: Certificates 2 and 3 to Harry Ford on the 13th day of December, 1915, and the 2d day of January, 1916, respectively; certificates 4 and 5 to Mrs. Gay Ford on the 28th day of January, 1916, and February 2, 1916, respectively.

The only error appearing in the second finding quoted is that by oversight or inadvertence we omitted to insert the word "respectively" after the word "receiver," appearing in the fourth line. The sentence quoted should have read as follows:

"The appointment of the receiver and the issuance of and sale of the receiver's certificates before mentioned was upon ex parte application of Charles G. Mugler and A. T. Page, receiver, respectively, without notice to any of the interveners or other creditors, and without their consent."

We have granted appellant's motion to the extent as above indicated, but in all other respects the motion is refused.